ROBERT L. MONTI, Plaintiff-Appellant, *v.* PAUL TANGORA *et al.*, Defendants-Appellees.

Fourth District    No. 16886

Opinion filed August 31, 1981.—Rehearing denied September 30, 1981.

576

William R. Scott, of Allen & Korkowski & Associates, of Rantoul, for appellant.

Leonard T. Flynn, of Franklin, Flynn & Palmer, of Champaign, for appellees.

Mr. JUSTICE LONDRIGAN delivered the opinion of the court:

Using a warranty deed recorded November 16, 1973, the defendants, Paul Tangora and John R. Kelly (sellers), conveyed a rooming house located at 206 East Green in Champaign to the plaintiff, Robert L. Monti (buyer). Subsequently, during August 1974, the city of Champaign (city) closed the rooming house for building code violations which the sellers had been aware of prior to the conveyance of the property to the buyer. The buyer brought a multicount suit for damages and, after a bench trial, the trial court entered a judgment in favor of the sellers and against the buyer. On appeal, the buyer contends that the trial court's judgment should be reversed because (contrary to the trial court's findings) (1) the sellers' attorney bound the sellers to a warranty of no notice of building code violations, (2) the sellers ratified the terms of the contract prepared by their attorney, and (3) the sellers breached the covenants contained in their warranty deed.

We affirm the trial court's judgment.

A more detailed recitation of the facts is necessary in order to understand our resolution of the buyer's first two issues. At trial, the evidence revealed that the sellers received repeated notices of the building code violations from the city during 1972. Also during 1972, buyer inquired about purchasing the property. He visited the premises two or three times that year, but brief negotiations did not produce an agreement.

During the summer of 1973, buyer bought the two lots immediately east of the rooming house. That September, buyer telephoned seller Tangora to renew his inquiry about purchasing the sellers' property. This telephone conversation, which did not include seller Kelly, produced an oral agreement between buyer and Tangora whereby buyer agreed to purchase the property by assuming its existing mortgage. Buyer testified that building code violations were not mentioned in this conversation or any other conversation. Tangora testified that code violations were discussed in this conversation and that the owners' intent was to walk away from the property. It appears that only a bare "agreement" was arrived at between buyer and Tangora, as they did not discuss the matter of easements or restrictions on the property, or title insurance. Nor did they discuss the type of deed to be used or the need to have spouses sign a deed.

Tangora contacted Attorney J. Michael O'Byrne of Champaign and directed him to prepare a contract for the sale of the property to buyer. Tangora did not give O'Byrne any direction concerning the type of deed to be used, the type of exceptions, restrictions or easements. Tangora testified at one point that he mentioned code violations to O'Byrne. He also testified that he was pretty sure that he did not discuss them with O'Byrne. O'Byrne testified that Tangora made no mention of the violations. Thereafter, O'Byrne prepared a contract and sent it to Attorney Carl Sinder in Champaign. The contract was prepared from a standard form. O'Byrne's testimony indicated that some paragraphs, including one warranting that sellers had no notice of code violations, were included automatically.

The parties also disputed whether the property had been posted with notice of code violations prior to the conveyance. Tangora testified that there were "stickers" on the property, indicating code violations, while plaintiff testified that there were none until 1974.

O'Byrne attached a note addressed to Tangora with the contract, requesting that when the contract was signed, to notify O'Byrne so that title insurance could be ordered. O'Byrne did not tell Sinder that he did not have his clients' approval of the provisions of the contract before sending the contract to Sinder. Sinder stated that the general custom of practice of attorneys in Champaign County was to prepare contracts with

only those provisions that had been authorized by the attorney's client. O'Byrne testified that this was not a matter of custom.

On November 16, 1973, plaintiff signed the contract prepared by O'Byrne in the office of Sinder. Later that morning, Sinder and O'Byrne met in the offices of O'Byrne to close the transaction. O'Byrne delivered a deed signed by the Tangoras and by himself as attorney-in-fact for the Kellys. O'Byrne promised a deed from the Kellys to confirm this deed when they returned to town. Sinder delivered a check for mortgage arrearages and for a share of unpaid bills and damage deposits to O'Byrne.

Sinder testified that he was reasonably certain that Tangora was present at the closing, and that Tangora signed the contract which had been prepared by O'Byrne. According to Sinder, the contract was then delivered to O'Byrne to have the other defendants sign the contract and return it to Sinder. According to O'Byrne, Tangora was not present at the closing, nor was the contract. He also testified that he did not transmit the contract to his clients and did not see it after initially preparing it until it was later returned to his office by Kelly. According to O'Byrne, Kelly told O'Byrne that he could not sign it because of the code violations paragraph.

Tangora acknowledged that after closing he received the contract from O'Byrne or picked it up from his office. Tangora further admitted that the purpose for the contract being delivered to him was for him to sign it. He testified that he signed the contract, then scratched his name out, because of the provision relative to code violations. He further stated O'Byrne called and asked for the contract back and that he said he did not want to go through with the deal because it was not right. He further related that O'Byrne picked up the contract from him and that he never saw it again.

Kelly first saw the contract when he returned to Champaign around December 1973. He admitted that the contract was brought to his house by Tangora. He testified that it was at his house for him to sign. He believed the scratched-out signatures of the Tangoras were on the contract when he first saw it. He refused to sign the contract because of the code violations provision. He and his wife did, however, sign a confirming deed and returned it to O'Byrne.

Buyer took possession of the premises on November 1, 1973, and continued to operate the premises as a rooming house until August 1, 1974. In August 1974, the plaintiff and his rooming house tenants received written notice from the city of the existence of building code violations. They also received notice from the city of the condemnation and closure of the premises because of the violations. Buyer secured, for the first time, a copy of the list of code violations sent to sellers in 1972. On August 16, 1974, the building was closed by the city because of the building code

violations. Shortly thereafter, Sinder visited the office of O'Byrne and requested a signed copy of the contract between the parties. O'Byrne told Sinder that the contract had not been fully signed and would not be signed or delivered to buyer.

The premises remained closed for seven or eight months. Then a portion of the premises was reopened. No formal demand was made on defendants to remedy the code violations.

Buyer argues that sellers' attorney bound sellers to a warranty that there were no code violations against the property. Buyer argues that on or about November 16, 1973, the closing date, the parties, through their agents-attorneys, orally agreed that buyer's exhibit No. 5, the partially executed written contract, was the parties' agreement. Buyer relies upon the admitted allegation of his complaint that O'Byrne was at all times acting within the actual or apparent scope of his authority as duly authorized attorney at law and agent for the defendants for the sale of the real estate. Buyer depends upon these admissions as admissions of well-pleaded facts. However, we view the allegation as merely being a conclusion of law, and not well-pleaded facts. One may ask what authority was actually given the agents by the principals, and what authority is apparent by one's status as attorney. Further, sellers specifically denied an averment that the terms of the parties' contract, entered into through their agents, are as stated in the partially executed contract document.

Buyer cites *Kamberos v. City of Chicago* (1937), 366 Ill. 471, 9 N.E.2d 223, *overruled on other grounds, Cohen v. City of Chicago* (1941), 377 Ill. 221, 232, 36 N.E.2d 220, 225, apparently for the proposition that one is bound by his complaint. Buyer cites also 1 Ill. L. & Prac. *Agency* §119 (1978), for the proposition that an attorney may be an agent for the sale of land. This is true. However, the same authority notes the case of *Fieschko v. Herlich* (1961), 32 Ill. App. 3d 280, 177 N.E.2d 376, which holds that the authority of an agent to bind his principal to a contract for the sale of realty must be in writing signed by the principal. The case also states that the agent can only sign a contract containing such terms as his principal authorizes. Furthermore, ratification of the agent's unauthorized signing must be in writing.

■■ Quite simply, the evidence of this case fails to demonstrate that O'Byrne had the authority to bind his clients to the terms of the contract he drafted but which they did not sign. Clearly, seller Kelly did not sign the contract. And, there was evidence that seller Tangora's signature, which was crossed out, was not effective. The trial court's ruling that O'Byrne did not bind sellers to the terms of the contract he drafted is not against the manifest weight of the evidence.

The buyer argues that through their actions and silence after Novem-

ber 16, 1973, sellers ratified the "oral agreement" made by their attorneys to the effect that there were no building code violations. Apparently, as part of his ratification argument, buyer submits that part of the problem with the trial court's decision "is its attempt to isolate an oral agreement of the parties from those matters agreed by the respective attorneys of the parties." Plaintiff notes that many matters performed by the parties were never discussed by the parties, but were agreed to by the attorneys. Thus, the "oral agreement" of the parties must consist of those matters the attorneys agreed to as well. In other words, the parties' agreement must be seen as those matters agreed to by the parties plus matters agreed to by the attorneys.

■■■ We find this argument to be unacceptable. Actually, it has little to do with the doctrine of ratification. If, as we have found, the sellers' attorney had no authority to bind them, then it is clear that any agreement made by him is not their agreement. Concerning the argument that the sellers ratified their attorneys' actions, *i.e.*, a warranty of no notice of code violations, we reject the buyer's unsupported argument that conveying the property via a warranty deed and failing to inform the buyer that they did not sign the contract somehow ratifies the terms of the unsigned contract. The trial court's finding that sellers did not ratify the attorney's actions is not against the manifest weight of the evidence.

Buyer contends that sellers breached the covenants contained in their warranty deed, which is a statutory warranty deed (Ill. Rev. Stat. 1979, ch. 30, par. 8). As such, it contains the implied covenants of seisin, against encumbrances, and of quiet enjoyment. (*Brown v. Lober* (1979), 75 Ill. 2d 547, 389 N.E.2d 1188.) Buyer argues that each of the covenants was breached when the sellers with notice of building code violations, conveyed the premises to buyer.

A. Covenant of seisin.

The covenant of seisin (synomymous with the covenant of good right to convey) assures the grantee that the grantor is, at the time of the conveyance, lawfully seized and has the power to convey an estate of the quality which he professes to convey. (*Brown.*) The covenant of seisin pertains to the title only and is not breached by the existence of an encumbrance. 3 Am. Law of Prop. §12.127 (1952).

■■ Buyer cites a number of cases in his argument that the covenant of seisin was breached. We believe that the cases are founded upon the concept of covenant against encumbrances, and hold that there has been no breach of the covenant of seisin.

B. Covenant against encumbrances.

An encumbrance is any right to, or interest in, land which may subsist in a third party to the diminution of the value of the estate, but consistent with the passing of the fee by conveyance. (*Brown.*) Although the word

"encumbrance" is said to have no technical, legal meaning, the covenant is construed broadly to include not merely liens such as mortgages, judgment liens, taxes, or others to which the land may be subjected to sale for their payment, but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted. 3 Am. Law of Prop. §12.128 (1952).

The case law in Illinois treating the issue of building code violations as encumbrances seems to consist of two cases: *Ableman v. Slader* (1967), 80 Ill. App. 2d 94, 224 N.E.2d 569; *Cox v. Supreme Savings & Loan Association* (1970), 126 Ill. App. 2d 293, 262 N.E.2d 74.

In *Ableman*, the court noted the rule that the existence of a building code violation does not of itself constitute a cloud on title where a real estate sales contract calls only for the passing of good title. The contract at issue called for the purchaser to take title subject to violations, if any, of the building, fire, and housing codes of the city of Chicago. A contract was entered into on February 28, 1966; on March 7, 1966, the parties entered into an escrow agreement; and on March 30, 1966, the city filed a lawsuit against the sellers to abate a nuisance arising out of code violations. The sellers sought an injunction to restrain the escrow agent from delivery of any escrow deposits to any person and requested a declaration that the city's lawsuit did not constitute an objection to title. The trial judge noted that no proofs were offered and that the purchaser objected to allowance of the injunction, but nonetheless entered an injunction. The appellate court held only that upon the record the chancellor could not have found the purchaser to have agreed to take title subject to the city's lawsuit. Consequently, it was error to have issued the temporary injunction.

In *Cox*, the city brought suit against the contract purchaser, contract seller, and the tenants of an apartment building, charging building code violations. A preliminary contract had been entered into in March 1962, amended in July 1962, and the city's suit was filed in January 1967. In 1967, nothing remained to be done under the contract except for purchaser to complete his payments and for seller to deliver a warranty deed. Seller had agreed to furnish within 30 days after November 7, 1962, a guarantee policy showing good and sufficient title to the seller. There was no suit concerning building violations pending within that period. The court said there was nothing that made the title not marketable, since there was no proviso in the contract calling for a title free of violations. Thus, the existence of a building code violation is not in itself a violation of a covenant to provide a good title; the court cited *Ableman*.

Plaintiff cites two cases from other jurisdictions to the contrary. (*Brunke v. Pharo* (1958), 3 Wis. 2d 628, 89 N.W.2d 221; *Oatis v. Delcuze*

(1954), 226 La. 751, 77 So. 2d 28.) In opposition to *Brunke* and *Oatis* are *McCrae v. Giteles* (Fla. 1971), 253 So. 2d 260; *Domer v. Sleeper* (Alas. 1975), 533 P.2d 9; *Gaier v. Berkow* (1966), 90 N.J. Super. 377, 217 A.2d 642, also cited by plaintiff.

In *Brunke*, an apartment building was conveyed on August 25, 1955. Suit was brought March 12, 1957, for breach of the covenant against encumbrances. It was alleged that at the time of conveyance, six violation orders of the Industrial Commission had issued, which apparently required substantial repairs to the premises. The Wisconsin supreme court noted that under State statute, each day that a violation of the building code exists is a separate violation with a penalty of not less than $10 nor more than $100. The grantees immediately became violators of the law upon accepting the conveyance and continuing the particular use for which the structure was presumably designed or adapted. The issuance by the commission of its certificate demonstrated that official action to compel alteration was eminent, and not merely a possibility. The court appeared to attach considerable importance to the fact that official action had been taken before the conveyance so that enforcement action was eminent after the deed was delivered.

■■ The court in *Brunke* recognized a split of authority among the jurisdictions, but plaintiff urges us, nonetheless, to adopt the Wisconsin rule. We have already noted two Illinois cases expressing the rule that a building code violation is not of itself an encumbrance. We therefore do not adopt the *Brunke* view. The problem created by the existence of code violations is not one to be resolved by the courts, but is one that can be handled quite easily by the draftsmen of contracts for sale and of deeds. All that is required of the law on this point is that it be certain. Once certainty is achieved, parties and their draftsmen may place rights and obligations where they will. It is the stability in real estate transactions that is of paramount importance here. See *Baker v. Loves Park Savings & Loan Association* (1975), 61 Ill. 2d 119, 333 N.E.2d 1.

C. Covenant of quiet enjoyment.

By the covenant of quiet enjoyment, the grantor warrants to the grantee, his heirs and assigns, the possession of the premises, and that he will defend the title granted by the terms of the deed against persons who may lawfully claim the same. There must be an ouster under a paramount title. *Brown.*

■■ Plaintiff cites only one case, *Berger v. Weinstein* (1916), 63 Pa. Super. Ct. 153. That case states that for the covenant of quiet enjoyment to be breached, there must be an eviction because of paramount title. The Pennsylvania superior court affirmed the judgment for the grantee on the basis of breach of the covenant against encumbrances. In the instant case, we find no showing of a paramount title in the city. We find also no right

of eviction as of the date of the conveyance, because the city had not as yet brought an action against the plaintiff. Consequently, there can be no breach of the covenant for quiet enjoyment.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

· TRAPP, P. J., and WEBBER, J., concur.