918 P.2d 1168

**CREATE 21 CHUO, INC.,**
Plaintiff–Appellee,

v.

**SOUTHWEST SLOPES, INC.,**
Defendant–Appellant.

No. 17129.

Intermediate Court of Appeals of Hawai'i.

June 19, 1996.

Robert L. Smith, Kailua-Kona, for defendant-appellant.

Michael J. Matsukawa, Kailua-Kona, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

BURNS, Chief Judge.

Defendant Southwest Slopes, Inc. (Southwest), appeals the circuit court's May 12, 1993 Judgment, upon a jury verdict, in favor of Plaintiff Create 21 Chuo, Inc. (Create 21), that (1) rescinded the land sale contract entered into by the parties; (2) pursuant to Hawai'i Revised Statutes (HRS) § 449–16.5 (1985), awarded Create 21 recovery of the amount of its aggregate deposits held in escrow, together with all interest earned thereon; and (3) denied Southwest's counterclaim for damages, permission to retain the $500,-000 deposit, and prejudgment interest. We affirm.

FACTS

Create 21 is a Hawai'i corporation and a subsidiary of Chuo Enterprises group (Chuo Group), a Japan corporation. Pan Sool Oh (Oh) is the chairman of the board of Chuo Group. The president of Create 21 is Oh's son, Yoshitaka "Teddy" Tsukimura (Tsukimura).

Southwest is a Kansas corporation. Southwest's president and majority stockholder is Robert L. Rice (Rice).

This case involves two adjoining parcels of real property (the Land) totalling 265.839 acres and located in 'Opihihale, South Kona. One parcel, Tax Map Key 3–8–7–14:6, is 264.34 acres and the other, Tax Map Key 3–8–7–14:23, is 1.499 acres. Southwest acquired the 264.34–acre parcel by a Commissioner's Deed on August 25, 1988. The 1.499–acre parcel was purchased by Rice in his individual capacity.

International Realty Corporation (IRC) is a Hawai'i real estate agency owned by Steven B. Dixon (Steven). In June or July of 1990, Create 21 contacted IRC to locate beachfront property on which Create 21 could build a large family estate and a marina for their boat. Dorothy Leeper (Leeper), an agent of IRC, showed the 'Opihihale property to Tsukimura. After Create 21 expressed an interest in the Land, IRC's principal broker, Lucy Dixon (Lucy), located Rice, informed Rice that IRC was representing Create 21 as a buyer, and obtained a courtesy listing agreement giving IRC the right to show the Land to Create 21. The courtesy listing agreement required Southwest to pay a 5% sales commission to IRC upon the sale of the Land.

Leeper testified that in July 1990, Oh, Tsukimura and others from Create 21 inspected the Land and were informed by Barry Williamson in relevant part as follows:

A. ... [H]e took Mr. Oh over to show them a well that is near the ocean on the

45 acres and he explained about all the history of the background of—I guess it was a large Hawaiian village around that area at the time. He was explaining about that.

\* \* \*

A. ... [H]e did give quite a bit of history on the King's Trail and how it's open to the public and the shoreline access they have along there; that in Hawaii [Hawai'i] I guess it's the law that that's open to the public.

\* \* \*

A. I indicated that since the fishing village was right on the water at the beach that the King's Trail went at an angle and it ended at the beach there and then it started up again—going up over towards the 265 [acre parcel].

On August 23, 1990 Rice signed for himself and for Southwest a "Seller's Real Property Disclosure Statement" (Disclosure Statement). It states in relevant part as follows:

TO THE BEST OF MY KNOWLEDGE WHICH IS THAT OF A LAYMAN AND NOT OF AN EXPERT, THE CONDITION OF THIS PROPERTY IS AS INDICATED BELOW:

\* \* \*

2. LAND

\* \* \*

g. What is the current zoning of the property? *Unplanned*[1] Have you applied for a change of zoning? *Yes*

When? *4/90* What is the status of the application? *Pending*

\* \* \*

4. TITLE

\* \* \*

f. Do you know of easements, licenses, restrictive covenants, boundary disputes, or third-party claims affecting this property (rights of other people to interfere with the use of this property or adjoining property in any way[) ]?
_____ If so, please explain *Footpath Easement on Extreme N.W. Corner.*

\* \* \*

9. DISCLOSURE

My broker _____ has advised me that it is advisable to make known any fact, defect or condition, past or present, relating to my property that a buyer might want and/or need to know. Other than listed above, there are no facts, defects or conditions known to me.

THIS STATEMENT IS A DISCLOSURE OF THE CONDITION OF THE PROPERTY BASED ON MY LAYMAN'S OBSERVATION OF VISIBLE, ACCESSIBLE AREAS, DOCUMENTS, AND CONDITIONS AND IS NOT A WARRANTY OF ANY KIND BY MYSELF OR MY AGENT AND IS NOT A SUBSTITUTE FOR ANY EXPERT INSPECTIONS OR WARRANTIES THAT THE BUYER MAY WISH TO OBTAIN.

(Footnote added).

The Disclosure Statement was initialed by Tsukimura. Southwest concedes that the foregoing Disclosure Statement "did not fully

---

[1]. The Hawai'i County Code, ch. 25, art. 18, (1983) states in relevant part as follows:

**Article 18. U, Unplanned Districts.**

**Section 25–230. Purpose and applicability.**
The U (unplanned) district applies to areas not subjected to sufficient studies to adopt specific district classification.
**Section 25–232. Permitted uses.**
 (a) The following are permitted uses in U districts:
 (1) One single-family dwelling per site.
 (2) Agricultural uses and buildings,.,...
 (3) Processing of agricultural products,....
 (4) Processing of agricultural products,....
 (5) Home occupations.
 (6) Piggeries and apiaries....
 (7) Hunting and fishing preserves or lodges.
 (8) Aquaculture activity.
 (9) Buildings and uses normally considered directly accessory to the above permitted uses.
**Section 25–234. Minimum building site area.**
 The minimum building site area in U districts shall be five acres.

disclose the rights of other people to interfere with the use of the property."

Leeper and Lucy prepared a standard Deposit, Receipt, Offer and Acceptance (DROA) contract. When it was signed by Tsukimura for Create 21 on September 13, 1990 and by Rice for Southwest on September 14, 1990, it became a contract (the Contract). In it, Create 21 agreed to purchase from Southwest approximately 245.5 acres of the Land for a total price of $2,350,000. Create 21 made an initial deposit of $50,000. The Contract designated Bank of Hawaii Escrow Services as escrow agent, scheduled closing on November 30, 1990, and required Create 21 to pay an additional $450,000 deposit thirty days after acceptance. However, in special term No. 1, it also stated that "[Create 21's] check to remain uncashed until the opening of escrow."

Paragraph 2(d) of the Contract states as follows:

> (d) **Title:** Seller agrees to convey the property with warranties vesting marketable title in Buyer, free and clear of all liens and encumbrances except *a utility and access easement to 20 acres retained by Seller.* [sic] and any other covenants, easements, reservations or restrictions now of record which do not materially affect the value of the property.

An Addendum to the Contract was signed by Tsukimura on September 13, 1990 and by Rice on September 14, 1990. The Addendum permitted Southwest to consolidate and re-subdivide the Land into a 245.5–acre parcel (to be sold to Create 21) and a 20–acre parcel (to be retained by Southwest). It also permitted re-subdivision of the 20–acre parcel into two 10–acre parcels if Southwest obtained a third tax key number for the Land. If Southwest did not complete "the consolidation and re-subdivision by the closing date, [Southwest would] convey the entire 265.5 acres to Create 21 subject to an option in favor of [Southwest]" to repurchase the 20–acre parcel for the sum of $10. If Southwest did not exercise the option within two years of the date of closing, Create 21 would pay the lesser of the appraised value of the 20–acre parcel, or $9,572 per acre.

Sometime between late September and early October of 1990, Oh, Steven, and Lucy inspected the Land. After observing the Land, Oh demanded that the reserved 20 acres be made part of the Contract because it was the only part of the Land with a beach and Oh would not purchase it without a beach.

Both Steven and Lucy testified that they advised Create 21 on several occasions to reserve a due diligence period during which Create 21 could examine the Land and cancel the transaction before the closing date if the Land was unsatisfactory. Steven testified that Create 21 declined to reserve a due diligence period because

> [t]hey wanted to buy the property for as low as possible price [sic]. They wanted to get that price down as low as possible. And we—Mr. Oh and I and the other people involved in negotiating on our side, felt that if we could close the contract quickly, pay—give Mr. Rice money really quickly, we could get it at a better price.

Oh testified that he relied completely on his agent Steven, who is an attorney, and therefore was not concerned about a due diligence period.

A modification (Modification) of the Contract was prepared by IRC and signed by Oh and Tsukimura for Create 21 on October 11, 1990. Rice signed for Southwest on October 14, 1990. This Modification relinquished Southwest's interest in the reserved 20 acres and provided for the purchase of the Land by Create 21. The new price was $2,681,440. All other terms of the Contract remained unchanged.

The Modification implicitly nullified the exception in the Contract's paragraph 2(d) by which Southwest had reserved an access and utility easement to the 20 acres.

In this opinion, we refer to the combination of the Contract, Addendum, and Modification as the "CAM."

When it was October 10, 1990 in Hawai'i, Steven faxed two letters to Oh and Tsukimura in Japan. The first states in relevant part as follows:

\* \* \*

[W]e have been trying to negotiate a new contract for you in which you would receive 20 additional acres. . . .

Mr. Rice's lawyer . . . does think the 20 acres does have an enforceable easement on the neighboring 60 acres. . . .

I called the owner of the 60 acres. He says that the 20 acres does not have an easement on his 60 acres, but that the 60 acres does have an easement on the 20 acres. He also says some individuals have the easement rights to go down to the beach. This is common in Hawaii [Hawai'i].

The second letter states in relevant part as follows:

\* \* \*

*Now* you are talking about buying some land (20 ACRES) that has a road and some easement issues connected with it. So you are getting full disclosure *before* you enter into a contract to buy it.

\* \* \*

I called the owner of the 60 acres. He says . . . that the 60 acres does have an easement on the 20 acres. He also says some individuals have the easement rights to go down to the beach. This is common in Hawaii [Hawai'i]. . . .

\* \* \*

There is only a very small section of road on the 20 acres. In Hawaii [Hawai'i], ocean front owners always have to share the ocean. As we told you, everyone has the right to walk along the ocean on the King's Trail.

(Emphasis in original.)

When it was October 11, 1990 in Hawai'i, IRC received a Preliminary Title Report (PTR) on the Land, prepared by Title Guaranty of Hawaii, Inc., and Steven prepared a preliminary analysis of the PTR, which he faxed, along with the PTR, to Oh and Tsukimura in Japan. Oh and Tsukimura received the PTR when it was October 13, 1990 in Japan, after they had already signed the Modification. The PTR identified the following items: (1) unrecorded grants of easements in favor of Hawaii Electrical Light Company, Inc.; (2) a recorded perpetual easement appurtenant for purposes of reasonable ingress and egress for fishing, over and across a portion of the property, in favor of Moses Kuahiwinui, et al.; (3) a recorded nonexclusive 15–foot wide easement in favor of Stanley H. Roehrig and Janice H. Roehrig; (4) a recorded nonexclusive appurtenant easement in favor of Stanley H. Roehrig and Janice H. Roehrig for use of the beach area of the property; and (5) any and all existing roads, trails, easements and rights of way.

Steven's October 11, 1990 preliminary analysis stated in relevant part as follows:

\* \* \*

At this time my summary conclusion is that if you proceed with your contract to purchase the 245.5 acres, you will not have any easements on that property, except the public easement along the King's Trail that we discussed earlier.

If you succeed in negotiating to buy the 20 acres, the 20 acres will at least be subject to a claim of easement from the grant to Moses Kuahiwinui, and the grants to Stan Roehrig. In essence, what these easements seem to mean is that these people have the right to go down the road and go fishing. If you object to this type of easement, I seriously suggest that you stop looking for waterfront property in Hawaii [Hawai'i]. I don't think you'll find any ocean front property which is not subject to easements of this type. . . .

On October 17, 1990 Oh met at his home in Waikloa with Steven and Lucy. Several aides to Oh were also present. The purpose of the meeting was to discuss the PTR.

Steven testified that after explaining to Oh the road, trail, easement, and right-of-way rights, beach access rights, fishing access rights, and King's Trail rights pertaining to the Land, he informed Oh that "if he wants to buy the beach, he wants to buy the property, he has to take it subject to those rights." According to Steven, Oh agreed to

take the Land subject to these rights. Oh, however, testified to the contrary. Oh testified that during the meeting, he told Steven that "unless all other encumbrances to title were not [sic] cleared the contract would have to be cancelled." He "was told [by Steven] that there was [sic] no encumbrances existing on the title, however, if such encumbrances should exist then such encumbrances shall be cleared accordingly."

Lucy testified that after the meeting, Create 21's representatives, along with Steven and Lucy, proceeded to the law office of Southwest's attorney Robert L. Smith (Smith), to finalize the deal. She further testified that Smith informed Oh "that [he was] holding the [Modification] signed by Mr. Rice and [was] not going to release it to [Create 21] until the money was put in escrow and [he] did not want the money if they were not accepting the condition of the property as it was and as it was told to them to date[,]" and that Oh agreed and handed over a check for $450,000, the remaining balance on the deposit.

In November 1990, Oh retained the services of a consulting firm (Okuhara Consultants) to recommend development possibilities for the Land. In a letter dated November 27, 1990, Create 21 exercised its right under paragraph K of the DROA to extend the closing date from November 30, 1990 to December 30, 1990. Create 21 received the report from Okuhara Consultants in December 1990. The report stated that archaeological sites on the Land may be significant enough to hinder Create 21's intended use of the Land, especially its "beach area." Further, a complete archaeological survey of the Land' would be necessary at a cost between $70,000 and $100,000. Thereafter, Create 21 demanded a rescission of the CAM and the return of its $500,000 deposit.

Hawai'i Revised Statutes (HRS) § 6E–5.5 (1985) establishes the Hawai'i Historic Places Review Board which "shall ... [o]rder and enter historic properties into the Hawaii [Hawai'i] register of historic places (HRHP) on the basis of their value to Hawaii's [Hawai'i's] heritage." When a particular historic property as defined in HRS § 6E–2 (1985) [2] is nominated for placement on the HRHP, the owner of the property, consistent with the Hawai'i Administrative Procedure Act, HRS Chapter 91, is notified of the nomination and given the opportunity to contest the nomination in a contested hearing. Hawai'i Administrative Rules (HAR) chapter 13–198, subchapter 2 (1988). Placement of a historic property on the HRHP subjects the property owner to the obligations and reservations expressed in HRS §§ 6E–10, –11, –12, –14, and –15.

After a privately owned parcel of real property has been placed on the HRHP, the owner's right with respect to the parcel is subject to HRS § 6E–10 (1985),[3] which states in relevant part as follows:

---

**2.** Hawai'i Revised Statutes (HRS) § 6E–2 (1985) states that " '[h]istoric property' means any building, structure, object, district, area, or site, including heiau and underwater site, that is significant in the history, architecture, archaeology, or culture of this State, its communities or the nation."

In 1992 the definition was changed. HRS § 6E–2 (1993) reads as follows: " 'Historic property' means any building, structure, object, district, area, or site, including heiau and underwater site, which is over fifty years old."

**3.** HRS § 6E–10 was amended in 1992. It now states in relevant part as follows:

**Privately owned historic property.** (a) Before any construction, alteration, disposition or improvement of any nature, by, for, or permitted by a private landowner may be commenced which will affect an historic property on the Hawaii [Hawai'i] register of historic places, the landowner shall notify the department [of land and natural resources] of the construction, alteration, disposition, or improvement of any nature and allow the department opportunity for review of the effect of the proposed construction, alteration, disposition, or improvement of any nature on the historic property. The proposed construction, alteration, disposition, or improvement of any nature shall not be commenced, or in the event it has already begun, continue, until the department shall have given its concurrence or ninety days have elapsed. Within ninety days after notification, the department shall:
(1) Commence condemnation proceedings for the purchase of the historic property if the department and property owner do not agree upon an appropriate course of action;
(2) Permit the owner to proceed with the owner's construction, alteration, or improvement; or
(3) In coordination with the owner, undertake or permit the investigation, recording, pres-

**Privately owned historic property.** (a) Before any construction, alteration, disposition or improvement of any nature, by, for, or permitted by a private landowner may be commenced which will affect an historic property on the [HRHP], the landowner shall notify the department [of land and natural resources] of the construction, alteration, disposition, or improvement of any nature and allow the department opportunity for review of the effect of the proposed construction, alteration, disposition, or improvement of any nature on the historic property. The proposed construction, alteration, disposition, or improvement of any nature shall not be commenced, or in the event it has already begun, continue, until the department shall have given its concurrence or ninety days have elapsed. Within ninety days after notification, the department shall either commence condemnation proceedings for the purchase of the historic property, permit the owner to proceed with the owner's construction, alteration, or improvement, or undertake to permit the investigation, recording, preservation, and salvage of any historical information deemed necessary to preserve Hawaiian history, by any qualified agency for this purpose.

(b) Nothing in this section shall be construed to prevent the ordinary maintenance or repair of any feature in or on an historic property that does not involve a change in design, material, or outer appearance or change in those characteristics which qualified the historic property for entry onto the [HRHP].

■ Placement of a privately owned parcel of real property on the HRHP because of the presence of an archaeological site on the parcel is an encumbrance in favor of the State of Hawaiʻi Department of Land and Natural Resources. There is no evidence in the record that any part of the Land is on the HRHP.

However, the presence of an archaeological site on a parcel of real property presents a problem to the owner even when the site is not on the HRHP. HRS §§ 6E–14, –15 and –42 (1993) state in relevant part as follows:

**§ 6E–14 Preservation activities by political subdivisions.** The political subdivisions of this State may engage in a comprehensive program of historic preservation, to promote the use and conservation of historic properties for the education, pleasure, and enrichment of the citizens of this State. The governing body of any political subdivision may establish an historic preservation commission to preserve, promote, and develop the historical resources of the political subdivision.

**§ 6E–15 Regulations, special conditions or restrictions.** In addition to any power or authority of a political subdivision to regulate by planning or zoning laws and regulations or by local laws and regulations, the governing body of any political subdivision may provide by regulations, special conditions, or restrictions for the protection, enhancement, preservation, and use of historic properties or burial sites. These regulations, special conditions, and restrictions may include appropriate and reasonable control of the use or appearance of adjacent or associated private property within the public view, or both, historic easements, preventing deterioration by wilful neglect, permitting the modification of local health and building code provisions, and transferring development rights.

**§ 6E–42 Review of proposed projects.** Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which may affect historic property or a burial site, the agency or office shall advise the department and prior to any approval allow the department an opportunity for review and comment on the effect of the proposed project on historic properties or burial sites, consistent with section 6E–43, including those listed in the [HRHP].

Allan Schiltz is an archaeologist. His name for the large parcel of real property

ervation, and salvage of any historical information deemed necessary to preserve Hawaiian history, by any qualified agency for this purpose.

**520**

bordering the south side of the Land is the "Akahi Property." He did preliminary surveys of both the Akahi Property and the Land. He testified in relevant part as follows:

## DIRECT EXAMINATION

\* \* \*

[By Create 21's Counsel]:
Marked in red. The Akahi Property is marked in red.

Q. Now, in blue, would you please outline if you would, the adjacent property that you were asked to do the preliminary survey on which is the subject property.

A. (Indicated.)

[Create 21's Counsel]: Thank you. The record can reflect that the witness has done that, your Honor.

Q. Mr. Schiltz, I noticed that you didn't run the blue line all the way down to the same area that you ran the red line. Is that the makai area?

A. Yes. We were asked to look at the area only above the pali. Right about that location, the cliff drops off a couple hundred feet down to the lower coastal bench.

\* \* \*

And we had four individuals out there and they were walking roughly 30 feet apart as in—kind of, you know, four people abreast walking in a straight line going along these three different transects. And while they were doing that, they try to identify or locate and identify archaeological features and sites.

And in this case, as with all cases, then we would put flagging tape up to identify—show where they are.

Q. How many sites were identified in this preliminary inventory along these transects?

A. I believe it's 148.

Q. It's 148 separate sites that were located?

A. Yes. Well, it's a little difficult to say for sure that that's the number of sites. That's certainly the number of features and sites that we found. Once the area is

cleared, we could find out some of those features are associated with others and they actually have fewer sites. But probably even more features.

\* \* \*

Q. Now, have you been able to form an opinion—before I ask, let me ask this next question. What would be the next step in identifying archaeological features on the subject property?

A. Well, we would, you know, do an inventory—you could do a reconnaissance survey of the entire property which would find all of the sites on the entire property—not just where we did this sample. Then go back out and complete it, turn it—complete it to an inventory level survey which would include clearing vegetation and mapping the sites, fully recording them, and then doing some excavation to see how deep the sites were if there were any deposits.

\* \* \*

Q. And that is what is called a reconnaissance survey?

A. The reconnaissance would be to survey and locate the sites, yes.

Q. And then after that is done, what would be the next step?

A. Then you would go to the inventory level and that would take the information from the reconnaissance level and collect more information out there by mapping, clearing, mapping the sites, mapping the features, and recording them.

Q. Do you—based on the work that you've done on the Akahi property and your opinion that some of these sites are related to the sites on the Akahi property, do you have any opinion as to what the probable cost would be to complete that type of inventory of the subject property?

A. Probably in the neighborhood of maybe $75,000.

Q. Based on the work that you have done, have you identified—the sites that you have identified with respect to the

subject property—can you tell us what has been found out about those sites?

A. In the subject property?

Q. Yes.

A. Well, we have a wide range of site types. We do have a lot of agricultural sites and features, agricultural mounds. There are terraces. We have good evidence of habitation residences. We've got some lava tubes that have some cultural materials in them. Down near the makai end of the mauka-makai transect is a cluster of sites that large paved terrace areas with water-worn pebbles and seashells and that type of thing which would suggest residence and perhaps some sort of religious activities, a number of platforms indicating house platforms—house foundations.

It would appear that the settlement pattern is similar to that on Akahi in that there was—there was certainly a lot of agriculture going on but then there was more permanent habitation than we would have normally suspected here.

\* \* \*

Q. And you found indications that there were permanent residences?

A. Yes.

Q. Amounting to a village?

A. Well, the—down right on the—right on the coast along the northern boundary of the property is a known archeological site that has been given the designation as a village. There is apparently coastal access there to the water so perhaps, it would have been an area where canoes could have been launched. I have not seen that site, but actually stone features show up on aerial photographs if they're good enough.

\* \* \*

Q. In order to determine whether or not any of those sites that are found—in order to put your mind at rest, I guess, as to whether any of those sites are indeed significant as you've defined it, what additional work has to be done?

A. Um, once we go past the inventory level, if that were completed, then we would go and we would have to develop a research design and treatment plan which is something that would be presented to the State—proposed to the State. Excuse me, that sets out certain research questions on how to address those questions.

And then we go into what's called a data recovery and go out to the sites and do more large scale excavation, more careful mapping of all the individuals [sic] features, collecting of information that might tell us whether or not the structures were contemporary and whether or not we could consider this or any of these clusters of features a village or just small isolated habitation sites.

Q. Now, once you make that report to the State, do you make recommendations to the State with respect to what can and should be done with the site that you consider significant?

A. Yes, we do.

Q. And what are those options that are available?

A. The state as well as the federal government, the guidelines layout[,] the most advantageous option is to avoid sites if possible. If any sort of development could go on without any sort of impact to the site, it would be better to preserve them. If that isn't feasible, then if sites are significant, further information content, then doing excavation and data recovery would be an appropriate recommendation.

With respect to the sites that were particularly unique or religious structures or burials, we would recommend that they be preserved.

Q. In your preliminary survey of the subject property, did you find anything that was—that suggested it might be particularly unique?

A. Well, we haven't seen enough of the project to really say for sure, but it would appear that the clusters of sites that border the Akahi project or property would be considered somewhat unique because there seem to be extensions of the same types— the same group of features or sites to the

south. So, and we're making that recommendation there.

Q. You're making—on the portion of those sites that are outlined in green that extend into the Akahi area, you're recommending those be preserved?

A. Yes.

Q. When you say that you recommend that they be preserved, what does that mean in practical terms?

A. In practical terms, they would be avoided by development. And they would be left alone essentially and somehow protected with a buffer zone so that somewhat their setting would be preserved also.

This buffer zone might be say 100 feet or so depending on what the—what was going to be built and what the site was like.

\* \* \*

## CROSS-EXAMINATION

[By Southwest's Counsel]:

Q. Mr. Schiltz, you are aware that—well, let me ask you this. When you did the—your archaeological work on the Akahi parcel, who were you working for?

A. Working for the group called the Akahi Joint Venture.

Q. And when you did the work for the—the preliminary work that you've done—the sample survey on the subject property, who were you working for?

A. We actually were contracted by an individual named Eugene Lum who was an agent for Akahi also.

■ Tom Leutenecker (Leutenecker), an attorney licensed to practice in Hawai'i, testified for Create 21 as "an expert in the field of quiet title issues, specifically whether encumbrances affect marketable title[.]"[4]

Leutenecker testified in relevant part as follows:

A. Yes. That map [the map that Mr. Schiltz prepared] shows on it that there are historical or archeological sites on this property. Those are ancient Hawaiian sites that were former dwelling areas.

Those—the existence of those sites is an encumbrance on this property because the legislature has said and has passed a law that says that when there are historical sites on a piece of property in Hawaii [Hawai'i] you cannot do anything until there's a study made to determine what is on the site and what the significance of the items on the site is.

If the owner wanted to build a road he would not be able to do so because the state wouldn't let him until such time as there was a study made of these sites.

Now, the reason that these sites encumber the property, and by encumbrance I mean that they reduce the use that the owner can make of the property, the reason is because, one, you cannot use the property, build a road, build a house.

You couldn't even dig a hole—you couldn't even dig a hole to plant a tree if by doing so you might disturb some kind of historical or archaeological site so something like digging a hole would not be permissible until such time as there was an

---

4. While witnesses may be permitted, in a proper case, to give an opinion on an ultimate *fact* involved in the case, there is a strong consensus among the jurisdictions, amounting to a general rule, that witnesses may not give an opinion on a question of domestic law or on matters which involve questions of law. The fundamental problem with testimony containing a legal conclusion is that conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury amounts to a usurpation of the court's responsibility to determine the applicable law and to instruct the jury as to that law. Expert as well as nonexpert witnesses are subject to the prohibition against testifying as to a question of law. The testimony of expert witnesses is, in general, confined to matters of fact, as distinguished from matters of law.

> Expert opinion testimony of attorneys on legal questions, other than that as to the law of another jurisdiction, is also generally excluded. Basically, expert or nonexpert opinion that amounts to a conclusion of law cannot be properly received in evidence, since the determination of such questions is exclusively within the province of the court. Nor can a party appeal to a jury to decide legal questions by presenting the opinions of public officers.

31A Am.Jur.2d, *Expert and Opinion Evidence* § 136 (1989) (emphasis in original) (footnotes omitted).

adequate study made of this property by an archaeologist.

There is something like 40 to 45 acres that without there having been a thorough study, just a preliminary study made, that has archaeological items on it, just to get to the point where you could do something on that property would be a time consuming and expensive proposition because you have to hire the archaeologist to go out and do the work.

Now, if the archaeologist reports back to the state that there are significant archaeological sites on here and the statute specifically talks about burial sites,[5] if there are burial sites on here the state is going to require the owner to set that site aside forever and put a buffer zone around it so that [it] can't be disturbed.

If that occurs that is a piece of land, a part of this land that forever will not be used by the owner of the property. Also, if there are religious sites, most specifically a heiau—I don't know if there are, but if there are any religious sites the state would require most likely those to be set aside and preserved.

The fact that these archaeological sites exist on this property means a couple of things. One, you can't do anything until you've made a study. Two, the study is going to be expensive and time consuming and, three, it's likely that some part of the property is going to be preserved and set aside so it would not be available for use by the landowner.

(Footnote added.)

Leutenecker also testified that the "archaeological findings on the property" are significant encumbrances on the property because, as I say, they prevent the owner from turning any dirt on this property. The owner can't do anything without going and getting a study made and then perhaps being required to set aside certain portions of this land in perpetuity so that this is not an insignificant encumbrance.

In contrast, archaeologist Paul Harmer Rosendahl testified for Southwest in relevant part as follows:

## DIRECT EXAMINATION

\* \* \*

Q. [By Southwest's Counsel]: Based upon your research and field inspection have you formulated an opinion as to how archaeological sites are to be treated on the subject parcel?

A. Yes.

Q. And what is your opinion.

A. I have both a general and a specific opinion. First, the general opinion is until you have gone through the formal state historic preservation review process which involves identification of sites, evaluation of them, review by the preservation office archaeologists and their confirmation of significance and treatment of sites, there is no way you can say exactly how archaeological sites, whether they can or cannot, for example, constrain or prevent any development.

\* \* \*

A. My specific—my opinion on this parcel is that while there are archaeological sites present in the parcel there is nothing there that is likely to in any way prevent or severely constrain any development of that parcel.

## PROCEDURAL HISTORY

On February 22, 1991 Create 21 filed a Complaint for rescission of the CAM. On October 26, 1992 Create 21 filed a First Amended Complaint in which it alleged in relevant part as follows:

4. On or about September 12, 1990, [Create 21] and [Southwest] entered into a Deposit, Receipt, Offer and Acceptance ("DROA") contract for the purchase by

---

5. After being amended on July 3, 1990, HRS § 6E–11(b) stated that

It shall be unlawful for any person, natural or corporate, to knowingly take, appropriate, excavate, injure, destroy, or alter any burial site or the contents thereof, located on private lands or lands owned or controlled by the State or any of its political subdivisions, except as permitted by the department.

[Create 21] of 265.5 acres of property owned by [Southwest] located at Opihihale ['Opihihale] 2nd, South Kona, Hawaii [Hawai'i]. The 265.5[sic] acres of property consisted of two separate parcels, one 264.34 acres in size, and one 1.499 acres in size....

5. At the time the parties entered into the DROA contract, [Southwest] had actual knowledge that the 264.34–acre parcel of property was subject to the following easements:

(a) Grants of Easement in favor of Hawaii Electric Light Company, Inc.

(b) Grant of a perpetual easement appurtenant for purposes of reasonable ingress and egress for fishing, over and across a portion of the property, granted to Moses Kuahiwinui, et al.

(c) A grant of a nonexclusive 15–foot wide easement (without purposes listed) to Stanley H. Roehrig and Janice H. Roehrig.

(d) A grant of a nonexclusive easement also encumbering to the subject property, to Stanley H. Roehrig and Janice H. Roehrig.

(e) The King's Trail, and prescriptive public rights thereon.

\* \* \*

Notwithstanding [Southwest's] actual knowledge of the existence of these easements as encumbrances against the property, [Southwest] failed to disclose the existence of these easements when the parties entered into the DROA contract. [Southwest's] actions were in effect misrepresentations which induced [Create 21] to enter into the DROA contract.

6. At the time the parties entered into the DROA contract, [Southwest] had actual knowledge, or should have had actual knowledge, that located within the 263.34–acre [sic] parcel of real property was (1) a major archaeological site, consisting of the remains of an ancient Hawaiian village and (2) there were over 112 archaeological findings on the property, and four to five of these findings are major archaeological sites. These sites make it highly unlikely that any improvements can be built in the area of the sites.

\* \* \*

12. The existence of the easements and the archaeological sites are material breaches of the Seller's fundamental duty to convey marketable title to the Buyer. [Create 21] is thus under no obligation to complete the contract and is entitled to terminate the DROA contract.

Southwest filed a counterclaim for damages, permission to retain the $500,000 deposit, and prejudgment interest.

In a Special Verdict Form signed on April 14, 1993, the jury answered "yes" to the following question: "Is Plaintiff Create 21 Chuo, Inc. entitled to cancel or rescind the Deposit, Receipt, Offer and Acceptance contract and recover its deposit of $500,000.00?" Consequently, in conformity with the court's instruction, it did not answer the following question: "Is Defendant Southwest Slopes, Inc. entitled to recover any damages for breach of contract by Plaintiff Create 21 Chuo, Inc.?" A judgment in accordance with the jury's verdict was entered on May 12, 1993.

## DISCUSSION

### A. A Valid Basis for the Jury's Decision

In essence, the following issues were presented to the jury: (1) on and pertaining to the Land, are the King's Trail, the recorded easements, the archaeological sites, or the rights that native tenants possibly have, material violations or breaches of Southwest's Disclosure Statement or of Southwest's promise in paragraph 2(d) of the Contract to convey "marketable title in Buyer, free and clear of all liens and encumbrances except ... covenants, easements, reservations or restrictions now of record which do not materially affect the value of the property[;]" and, if so, (2) did Create 21 waive its right, if any, to use as a basis for voiding the CAM, Southwest's material violation of Southwest's Disclosure Statement or breach of Southwest's promise in paragraph 2(d) of the Contract?

An "encumbrance" is any right or interest existing in a third person that diminishes the value of the estate to the grantee, but which is consistent with the passage of the estate to the grantee. [6A POWELL on REAL PROPERTY § 900[2], at 81A–135 (1993) ].

Although the word encumbrance is said to have no technical, legal meaning, the [term] is construed broadly to include not merely liens such as mortgages, judgment liens, taxes, or others to which the land may be subjected to sale for their payment, but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted.

*Monti v. Tangora*, 99 Ill.App.3d 575, 580–81 [54 Ill.Dec. 732, 737] 425 N.E.2d 597, 602 (1981). Stated more succinctly, an encumbrance is any "burden resting either on the real estate itself, or on the title thereto, which tends to lessen the value, or interferes with its free enjoyment." [7 THOMPSON ON REAL PROPERTY § 3183, at 274 (1962) ].

*S. Utsunomiya Enters. v. Moomuku Country Club*, 75 Haw. 480, 502, 866 P.2d 951, 963 (1994). In *Utsunomiya Enters.*, the Hawai'i Supreme Court held "that a *lis pendens* is an 'encumbrance' as that term has been traditionally defined." *Id.* at 503, 866 P.2d at 963.

■ Leutenecker testified that the presence of one or more significant archaeological sites on a parcel of real estate can reasonably be expected to materially inhibit, impede, or preclude applications for permits for construction, alteration, or improvements and rezoning. Leutenecker's testimony is evidence that the presence of a major archaeological site on a parcel of real estate is an encumbrance.

■ The evidence in the record permitted the jury to decide that the recorded easements, and the archaeological sites on the Land, were material breaches of Southwest's promise to convey "marketable title in Buyer, free and clear of all liens and encumbrances except ... covenants, easements, reservations or restrictions now of record which do not materially affect the value of the property[,]" and that Create 21 did not waive its right to use these material breaches as bases for voiding the CAM.

### B. Point on Appeal

■ Southwest contends that: "THE JUDGE FAILED TO INSTRUCT THE JURY THAT THE PARTIES *ENTERED INTO A NEW CONTRACT ON OCTOBER 17, 1990* [.]"

■ Whether a jury instruction properly states the law is a question this court will review *de novo*, *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994), under the right/wrong standard. Although in some situations the trial court has no discretion and either must give or decline to give a requested instruction, a trial court's refusal to give a requested jury instruction is generally reviewed for abuse of discretion. *Id.* (citing *City & County v. International Air Serv.*, 63 Haw. 322, 339, 628 P.2d 192, 199 (1981); and *Tittle v. Hurlbutt*, 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972)).

The circuit court declined to instruct the jury as follows:

Defendant's Proposed Jury Instruction No. 15:

You are instructed that Plaintiff's Exhibit 25, the Modification to DROA dated September 12, 1990, was an offer by [Create 21] to enter into a new contract. It was accepted by [Southwest] on October 17, 1990 by delivery of the contract signed by Robert Rice to the Plaintiff's representatives, thereby forming a contract.

Defendant's Proposed Jury Instruction No. 20:

You are instructed that on October 17, 1990, the parties entered into a new, valid and enforceable contract.

Southwest contends that the Modification was a new contract and, therefore, Create 21

could not have argued that the real property disclosure statement was inadequate because at the time that the modification agreement was entered into, [Create 21]

has [sic] been furnished with a title report on the property, ... the licensed realtor/attorney representing [Create 21] in the transaction, Steven Dixon, had discussed and familiarized himself with the encumbrances, and had agreed to take the property subject to the encumbrances....

\* \* \*

... There is no other instruction which advised the jury that the modification agreement constituted a new contract. The jury was therefore led to believe that the adequacy of [Southwest's] disclosure was measured by the knowledge that [Create 21] had of the property upon entering into the original contract a month earlier.

We disagree with this point. In this appeal, Southwest does not challenge the following jury instruction.

> When two contracts between the same parties are only partly inconsistent, the earlier contract is superseded only to the extent of the modification or inconsistency.
>
> The consistent or unmodified portion will continue in effect.

The parties and the court permitted the jury to decide the extent to which the Modification superseded the Contract. The jury's answer is not error.

### C. Point on Appeal

■ The circuit court instructed the jury in relevant part as follows:

Plaintiff's Instruction No. 74:

> Encumbrances include all rights to or interests in the land, to the diminution of its value, but consistent with the passage of the fee, and embrace those which affect title or the record thereof, and those which affect or relate to the actual physical conditions upon the realty.

Southwest objected on the ground "that the definition was overbroad and should not include a reference to the physical condition of the property as opposed to the title to the property."

The circuit court declined to instruct the jury as follows:

Defendant's Proposed Jury Instruction No. 18:

> Words should be interpreted in accordance with their plain, common and ordinary meaning. An archaeological site is not something that one would ordinarily think of as an encumbrance.

In the light of the *S. Utsunomiya Enters. v. Moomuku Country Club, supra,* definition of an encumbrance, we conclude that Plaintiff's Jury Instruction No. 74 was not wrong.

### D. Point on Appeal

Southwest contends that "THE JUDGE ERRED IN INSTRUCTING THE JURY THAT THE SELLER'S OBLIGATION TO CONVEY UNENCUMBERED TITLE WAS UNAFFECTED BY *THE BUYER'S KNOWLEDGE OF THE ENCUMBRANCE* [.]" We conclude that the instruction was not error.

The circuit court instructed the jury in relevant part as follows:

Plaintiff's Jury Instruction No. 2:

> Where an agreement to purchase realty contains an express provision against encumbrances, a breach of that condition entitles the buyers to rescind the contract and serves to deny the sellers the relief of specific performance.

Plaintiff's Jury Instruction No. 12:

> The buyer cannot be required to pay for what he did not agree to purchase. If a buyer protects himself against an encumbrance by a positive covenant that the property is to be conveyed to him, clear of all such encumbrance, he is entitled to the benefit of his contract whether he had knowledge of the existence of the encumbrance or not.

Southwest contends that Plaintiff's Jury Instruction No. 12 "was tantamount to directing the jury to find in favor of [Create 21] and to disregard the fact that [Create 21], as purchaser, *knew* of the encumbrances on the property and *intended* to purchase the property *with* the encumbrances thereon." (Emphases in original.)

The circuit court declined to give the following instructions:

Defendant's Proposed Jury Instruction No. 2:

The parties are presumed by law to have contracted with reference to the existing state and condition of the property. If an easement to which it is subject is open and visible, the Purchaser is supposed to have been willing to take the property as it was at the time, subject to such burden.

Defendant's Proposed Jury Instruction No. 3:

As to obvious roads, the party proposing to buy, having full knowledge of the servitude and the necessity therefor as a means of egress and ingress to the premises, contracts subject to the physical and visible burden imposed upon the land.

Defendant's Proposed Jury Instruction No. 11:

An agreement to deliver a Warranty Deed with full and usual covenants must be construed in the light of the factual circumstances prevailing in any particular case. Where an encumbrance is open and visible and the Purchaser admits his familiarity of the property, he is charged with knowledge not only of the encumbrances, but of the fact that the Seller could not warrant title to the property including the encumbrance. Under such circumstance, in the absence of evidence that the parties to the transaction intended to warrant title to the extent of including the encumbrance, the Purchaser must be presumed to have understood that either a reservation or exception would be made to the title to be warranted.

 Southwest's point involves two separate theories. The first theory pertains to Create 21's alleged knowledge of the four recorded easements and the King's Trail before it signed the CAM. The general rule regarding knowledge of easements and encumbrances is stated in *Waterhouse Trust Co. v. Freitas*, 33 Haw. 139 (1934).

[T]he parties, in the absence of anything to the contrary, are presumed to have contracted with reference to the existing state and condition of the property and if an easement to which it is subject be open and visible and of a continuous character the purchaser is supposed to have been willing to take the property as it was at the time, subject to such burden. The easement in question was open and visible and was known by the respondent to exist prior to his entering into the contract to purchase the property, and it is to be presumed in the absence of any showing to the contrary that the existence of this encumbrance was considered in fixing the price[.]

33 Haw. at 146.

 In this case, however, Southwest was legally required "to convey ... marketable title in Buyer, free and clear of all liens and encumbrances except *a utility and access easement* ... and any other covenants, easements, reservations or restrictions now of record which do not materially affect the value of the property." In other words, Southwest was legally required to convey marketable title and to convey a title that was free and clear of all liens and encumbrances except recorded covenants, easements, reservations or restrictions which did not materially affect the value of the Land. Consequently, the *Waterhouse Trust Co.* presumption does not apply, and the applicable rule is as follows:

The buyer cannot be required to pay for what he did not agree to purchase.... When one protects himself against an incumbrance by a positive covenant that the property is to be conveyed to him clear of all such incumbrance, he is entitled to the benefit of his contract whether he had knowledge of the existence of the incumbrance or not.

*Clarke v. Title Guar. Co.*, 44 Haw. 261, 268–69, 353 P.2d 1002, 1006 (1960) (quoting *Patterson v. Freihofer*, 215 Pa. 47, 64 A. 326 (1906)).

 The second theory pertains to the question whether Create 21 waived any of its rights under the CAM. This question was presented to the jury by the following jury instructions, which Southwest did not appeal:

The purchaser may waive objections to the title and thereby preclude himself from thereafter setting them up in defense of a suit by the vendor to compel him to perform or to recover damages for his refusal.

A vendee cannot take advantage of a defect in the title as an excuse for not performing where he has led the vendor to believe that such defect was not objectionable.

A purchaser of land may rely on material representations made by the seller and is not obligated to ascertain whether such representations are truthful.

The jury's answer in favor of Create 21 is supported by substantial evidence.

## CONCLUSION

Accordingly, we affirm the circuit court's May 12, 1993 Judgment.