ROBERT FREEMAN and GWENDOLYN FREEMAN, Plaintiffs-Appellants, *v.* MILTON S. BOYCE and OLIVIA S. BOYCE, Defendants-Appellees

NO. 8319

(CIVIL NO. 2015)

APRIL 12, 1983

LUM, ACTING C.J., NAKAMURA, PADGETT, AND HAYASHI, JJ., AND CIRCUIT JUDGE HUDDY ASSIGNED BY REASON OF VACANCY

328

*Per Curiam.* Robert Freeman and Gwendolyn Freeman (the Freemans) appeal from a judgment of the Circuit Court of the Fifth Circuit denying them specific performance of their agreement to purchase real property situated at Kalaheo, Kauai from Milton Boyce and Olivia Boyce (the Boyces). Concluding that the requested remedy should have been granted because the possible barrier to performance by the Boyces was removed within a reasonable time of the date specified for the "closing" of the agreement, we reverse the circuit court.

I.

The subject property is a 24.78 acre parcel of unimproved land which the Boyces acquired in 1972 through a sub-agreement of sale. They subsequently agreed to sell the property to Mr. and Mrs. Albert Braun (the Brauns) by way of a sub-sub-agreement of sale. The contract between the Boyces and the Brauns was evidenced by a DROA[1] executed on July 6, 1977. The DROA stipulated that "time was of the essence" in the consummation of the contract and it was to be closed on or before October 1, 1977. Although the closing date was later extended to November 1, 1977, the agreement was never

---

[1] DROA is the acronym for Deposit, Receipt, Offer, and Acceptance, which is the standard form executory contract generally used in Hawaii when real property or interests therein are sold.

closed. The Boyces ascribe the failure to consummate the contract to the Brauns' intransigence on the terms relating to the satisfaction of the underlying agreement between the fee owner and the party from whom the Boyces obtained their interest in the land. And they have maintained throughout these proceedings that the Brauns' contract was unenforceable after November 1, 1977.

The Freemans tendered their offer to purchase the subject property on November 17, 1977 through Robert Prosser, a real estate broker. When he inquired of the Boyces whether such a bid would be entertained, he was instructed by Mr. Boyce to transmit the DROA containing the offer directly to Paul Klaverkamp, an attorney in Minneapolis, because of a concern about the prior agreement with the Brauns. The broker forwarded the document to Mr. Boyce's lawyer as instructed, and the DROA was subsequently returned to him with the Boyces' signatures affixed. But attached to the document was an "addendum" prepared by Mr. Klaverkamp which had also been signed by the Boyces. The appendix in pertinent part stated:

> Sellers entered into a Purchase Agreement covering the premises in July of 1977 which included certain contingencies. These contingencies were not fulfilled and the closing date passed with both sides rejecting the contract. However, section 7 of the Purchase Agreement should be interpreted to deny purchasers an action for damages or specific performance if (and only if) a closing cannot be held because the purchasers under the July agreement prevent said closing.

The attorney's covering letter provided an explanation for the added language; it also reiterated the concern expressed earlier by Mr. Boyce about the previous unconsummated contract.[2]

---

[2] The letter read as follows:

Enclosed please find executed Purchase Agreement which has been modified only to the extent of the two items on the Addendum.

The first item is merely a clarification that we do not have fee title at this time but only a subvendees' interest. The second item is an effort to explain our situation with the first Purchase Agreement.

The Freemans accepted the additional provisions drafted by the Boyces' lawyer on December 13, 1977. The augmented DROA fixed a February 1, 1978 closing date for the transaction. But unlike the Boyce-Braun contract, it contained no provision that time was to be considered essential in its performance.

Meanwhile, however, the Brauns were still pressing to complete their transaction in the face of assertions by the Boyces that the contract had expired and they were "no longer interested in looking at Purchase Agreements that have lengthy addendums." By letter dated December 11, 1977, a real estate broker acting on behalf of the Brauns informed Mr. Klaverkamp of their continuing interest in consummating the agreement. The letter further conveyed a threat that "if no substantial progress has been made toward closing by the end of this month [December] Mr. Braun appears to have no recourse but to deposit funds in escrow sufficient to close the transaction and commence an action for specific performance." The attorney for the Boyces responded with a detailed recapitulation of their position, which essentially was that the inflexibility of the Brauns had rendered closing impossible. His parting shot was: "The Boyces do not understand from a layman's standpoint, nor I from a legal standpoint, why the Purchase Agreement did not terminate by its terms on November 1, 1977."

Mr. Prosser was apprised of the foregoing events and the possibility that the Boyces might be prevented from fulfilling the purchase agreement with the Freemans. But a copy of the strongly worded letter outlining the Boyces' position with respect to the termination of the Brauns' purchase agreement was also given to the broker.

---

We are 99% certain that the previous deal is dead and we intend on no further negotiations with them. The Boyces' only concern is that in case they start a lawsuit or a similar action to restrain us from selling to your buyer, they do not want to be subject to damages in that event when they have no control over the situation.

If you find this satisfactory, please have your client initial the Addendum and return it to this office. If different language, while protecting us, could better satisfy them then give me a call.

The Brauns subsequently retained a Kauai attorney who wrote Mr. Klaverkamp on December 29, 1977, again threatening suit to enforce the Boyce-Braun agreement if it was not closed within a month. This did not appear to affect the Boyces' resolve; they claimed as before that the contract had expired on November 1, 1977. The Brauns then followed up by placing funds in escrow to be applied to the agreement. But the promised suit to enforce performance did not materialize. Even the threat of legal action faded away on May 20, 1978 when Mr. Klaverkamp was notified that Mr. Braun had purchased an adjoining parcel of property and the contract had been "cancelled."

The Freemans in the meantime took steps to demonstrate an active interest in their agreement. On February 6, 1978 they sent a letter to the sellers proposing an extension of the closing date to August 1, 1978. The sellers were also informed thereby that $5,000 had been deposited with the Security Title Corporation, the "escrow" designated by the agreement. Though the letter acknowledged the plight of the Boyces and that the transaction could not be closed "at this time due to threatened litigation," it also reiterated the Freemans' understanding that the agreement was still viable. The Boyces, however, failed to respond to a request to "note your approval of the extension by signing below."

On April 13, 1978, the Boyces' attorney instructed an agent of the Security Title Corporation to "return all documents and earnest monies to Dr. Freeman that he may have deposited with you" and also asked the Freemans' broker to "return the Purchase Agreements executed with Dr. Freeman." But the attorney assured the broker that "[w]e will be in contact with you again when the Braun matter has been resolved." The record discloses neither an assent by the Freemans nor action by the title company on the unilateral requests. The record, however, reveals that on June 27, 1978, the manager of the company's Kauai office responded, stating in part: "The seller does not want to sell; the purchaser wishes to proceed. Escrow cannot continue until an agreement is reached between the Seller and the Buyer." The purchasers' request to proceed had been made earlier on May 31, 1978 by an attorney retained by the Freemans.

The complaint for specific performance brought by the Freemans on September 6, 1978 was tried before the circuit court on September 29, 1980, and judgment in favor of the Boyces was entered on March 31, 1981. Although the circuit court concluded "[t]ime was not of the essence" in the performance of the agreement, it ruled the Boyces were "legally and equitably entitled to cancellation of the transaction contemplated by the Boyce-Freeman DROA" because a lawsuit against the Boyces appeared likely on February 1, 1978. It further concluded that "[u]nder the circumstances of this case, it would be inequitable to compel specific performance by the Boyces."

The questions posed by the Freemans' appeal, therefore, are whether the Boyces were legally entitled to unilaterally cancel the purchase agreement and whether the record sustains a conclusion that it was inequitable to compel specific performance by the Boyces.

## II.

We begin our analysis by examining the executory contract for the sale of land signed by the parties, a DROA with an addendum prepared by the sellers' attorney. A properly executed DROA, we have said, "binds the buyer to buy and the seller to sell a particular property at a fixed consideration." *State v. Kunimoto,* 62 Haw. 502, 508, 617 P.2d 93, 98 (1980); *see also State v. Pioneer Mill Co.,* 64 Haw. 168, 174, 637 P.2d 1131, 1136 (1981). Though no one challenged the execution of the DROA, the circuit court nonetheless concluded the sellers were not bound thereby. Their performance was excused because the court concluded the buyers had waived the right to seek performance by accepting the addendum, which provided that the contract should be interpreted to deny such right "if (and only if) a closing cannot be held because the purchasers under . . . [a prior] agreement prevent . . . [such] closing," and on the exact day designated for closing there was a likelihood that legal proceedings might be instituted.

Courts, however, have seldom regarded time as absolute or unbending within the context of a bilateral contract for the purchase and sale of land. 3A *Corbin on Contracts* § 716

(1960). For "[u]nless otherwise specifically provided by the parties, the general rule is that time is not the essence in a contract for the sale of land. *Guy v. Hanley,* 111 N.H. 73, 276 A.2d 1 (1971); *Knable v. Bradley,* 430 Pa. 153, 242 A.2d 224 (1968); *Reutt v. Jordan,* 207 Va. 869, 153 S.E.2d 197 (1967)." *Gum v. Nakamura,* 57 Haw. 39, 44, 549 P.2d 471, 475 (1976); *see also Lum v. Stevens,* 42 Haw. 286, 288 (1958) (In suits for specific performance, "time is not ordinarily regarded as of the essence of a contract."). Here, as the circuit court found, the parties chose not to make performance within the stated period essential. Yet, specific performance was denied buyers who stood ready to fulfill their end of the bargain exactly as stipulated. Viewing the relevant circumstances in the light of controlling precedent, we perceive no grounds to sustain such denial.

The circuit court premised its refusal of relief on the language in the appendix to the DROA providing that the Freemans would have no "action for damages or specific performance if (and only if) a closing cannot be held because the purchasers under the July agreement prevent . . . [such] closing." It concluded "the Boyces were prevented from performing" because "[b]y February 1, 1978, the agreed closing date of the Boyce-Freeman DROA, the Brauns' acts and demands made a lawsuit by them against the Boyces appear likely." That the Boyces were prevented from performing merely because a possibility of suit existed on February 1, 1978 is open to serious doubt. But we do not find it necessary to discuss the validity of this conclusion. For the court unjustifiably regarded the time specified for performance as absolute despite its finding that it had not been made so by the parties.

### III.

The circuit court further concluded "it would be inequitable to compel specific performance by the Boyces"; yet nothing in the findings rendered by the court supports this conclusion.

The findings do not recite that the delay in the closing of the agreement deprived the Boyces of anything they had bargained for. Nor is there even an allusion to a possible forfeiture of any part of the consideration they were entitled to receive. To hold

the Boyces to their agreement for a period of four months beyond February 1, 1978 would hardly be unreasonable, especially where the delay in performance was attributable to them and not the Freemans; on the other hand, to deny the Freemans what had been bargained for when they were willing and able to perform exactly as agreed would not be consonant with principles of equity. "By the terms of the contract the land ought to be conveyed by the vendee, and the purchase price ought to be transferred to the vendor." 2 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 368 (5th ed. 1941); *see also* 4 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 1402 (5th ed. 1941).

The judgment of the circuit court is reversed, and the case is remanded for the entry of a judgment consistent with this opinion.

*Calvin K. Murashige* (*Clinton I. Shiraishi* with him on the briefs; *Shiraishi & Yamada,* of counsel) for plaintiffs-appellants.

*Robert Bruce Graham, Jr.* (*Hamilton, Gibson, Nickelsen, Rush & Moore,* of counsel) for defendants-appellees.