933 P.2d 1372

**Cynthia WARNER, Mark Sheehan and Ben Bollag, Plaintiffs–Appellants,**

v.

**Frank DENIS and Vetra Denis, Defendants–Appellees.**

**No. 16026.**

Intermediate Court of Appeals of Hawai'i.

Feb. 27, 1997.

Dennis Niles (Paul, Johnson, Park & Niles, of counsel), on the brief, Wailuku, for defendants-appellees.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

BURNS, Chief Judge.

Plaintiffs Cynthia Warner (Warner), Mark Sheehan (Sheehan), and Ben Bollag (Bollag) (collectively, Plaintiffs) appeal the circuit court's April 22, 1992 Amended Judgment in favor of Defendants Frank Denis (Frank) and Vetra Denis (Vetra) (collectively, Defendants), and the February 25, 1992 Order Denying Plaintiffs' Motion for Reconsideration of Award of Attorneys Fees in Order Directing Entry of Judgment in Favor of Defendants Filed [January 9, 1992].[1] We conclude that the judgment in favor of defendant Frank is wrong.

Plaintiffs brought this case against Defendants to enforce a contract for their purchase of land and to recover damages resulting from the breach of the contract.[2] The circuit court (A) dismissed the specific performance claim, (B) entered judgment in favor of the Defendants on the breach of contract damages claim, and (C) awarded Defendants $40,990.07 in attorney fees, $4,386.89 in costs, and interest at the rate of ten percent per annum on the entire judgment. Plaintiffs appeal (B) and (C). We conclude that with respect to Frank, (B) and (C) are wrong.

## BACKGROUND

### A. *The Contract*

Frank and Vetra are husband and wife. As joint tenants, they owned adjoining Lots

Larry Gilbert and Robert Carson Godbey (Gilbert Jeynes & Godbey, of counsel), on the briefs, Honolulu, for plaintiffs-appellants.

1. In their First Amended Notice of Appeal, Plaintiffs indicated that they were also appealing from the February 25, 1992 Order Denying Plaintiffs' Motion for Reconsideration of Award of Attorneys Fees in Order Directing Entry of Judgment in Favor of Defendants Filed [January 9, 1992] (February 25, 1992 Judgment). However, since the February 25, 1992 Judgment did not dispose of all of Plaintiffs' claims, it was neither final nor appealable. *Ciesla v. Reddish*, 78 Hawai'i 18, 20, 889 P.2d 702, 704 (1995).

2. The original complaint filed by Plaintiffs-Appellants Cynthia Warner (Warner), Mark Shee-

han (Sheehan) and Ben Bollag (collectively, Plaintiffs) alleged two counts, one for specific performance and the other for breach of contract damages. Subsequently, Plaintiffs amended their complaint to add claims against Defendant–Appellee Frank Denis (Frank) for breach of warranty of authority, estoppel, negligent misrepresentation of authority, and wilful misrepresentation of authority, and against Defendant–Appellee Vetra Denis for estoppel. These latter claims were subsequently dismissed by stipulation of the parties.

254, 255, and 256 in the Kalua Koʻi subdivision in West Molokaʻi. In July 1988, Frank listed Lot 254 for sale through Jim Kingzett (Kingzett) of InterSource Realty Inc. On December 9, 1988, Warner, on behalf of herself and undisclosed others,[3] offered to purchase Lot 254 through Kingzett. On the same day, Sheehan and Warner, for themselves and undisclosed others,[4] made a separate offer for Lot 256. The offer for each lot was made on the May 1988 version of the Hawaiʻi Association of Realtors Standard Forms Deposit, Receipt, Offer, and Acceptance (DROA),[5] which included the standard "marketable title" and "time-is-of-the-essence" clauses.

The DROA for Lot 256 represented that Warner had provided an initial deposit of $1,000 and would pay an additional $4,000 deposit within "24 working days from acceptance of this offer." According to the terms of the DROA, Warner offered to purchase Lot 256 for $455,000, with a closing date of April 9, 1989. Warner proposed to pay the purchase price through a $100,000 down payment, a five-year, ten percent (10%) interest-only purchase money mortgage to be financed by the sellers, and a $350,000 balloon payment "due 60 months from date of closing of this transaction." Special Term No. 1 of the offer part of the DROA stated that the offer was "contingent upon buyer inspecting property/boundaries within 24 working days of this offer's acceptance."

The Standard Terms of the DROA stated in relevant part as follows:

### B. EVIDENCE OF TITLE:

Seller shall furnish Buyer evidence of title from a licensed abstractor showing Seller's marketable title to the interest which is to be conveyed to Buyer. If Seller fails to deliver title as herein provided, Buyer at his option may terminate the agreement and any deposits shall be returned to Buyer. The foregoing shall not exclude any other remedies available to Buyer.

### C. STAKING:

Seller shall order and pay for the cost of staking by a licensed surveyor if stakes are not visible. If Buyer wishes to confirm the accuracy of staking, he may order a survey prior to closing and Seller agrees to reimburse Buyer for the cost of this survey on or before closing only if the original stakes prove to be inaccurate. This provision does not apply to a condominium or cooperative apartment.

\* \* \* \* \* \*

### K. TIME IS OF THE ESSENCE:

If either Buyer or Seller for reasons beyond his control cannot perform his obligation to purchase or sell the property by the closing date, then such party by giving escrow written notice prior to the closing date called for in this contract with copies to all parties to this contract, can extend closing for no longer than 30 calendar days to allow performance. Thereafter time is of the essence and the default provisions of Paragraph H apply. Any further extension must then be agreed to in writing by both parties. There is no automatic right to extend. This provision relates only to the extension of the closing date.

The DROA for Lot 254 included similar terms, except that the purchase price offered was $395,000, to be financed through a $95,000 down payment, a similar five-year, interest-only purchase money mortgage, and a $300,000 balloon payment.

Defendants did not sign either DROA. Instead, on December 23, 1988, King-

---

3. The Deposit, Receipt, Offer, and Acceptance (DROA) for Lot 254 listed the buyers as "Cynthia L. Warner et all [sic]."

4. The DROA for Lot 256 listed the buyers as "Mark Sheehan, Cynthia L. Warner et all [sic]."

5. "DROA is the acronym for Deposit, Receipt, Offer, and Acceptance, which is the standard form executory contract generally used in Hawaii [Hawaiʻi] when real property or interests therein are sold." *Freeman v. Boyce*, 66 Haw. 327, 328 n. 1, 661 P.2d 702, 703 n. 1 (1983). An "executory contract" is "[a] contract that has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future." *Black's Law Dictionary* 570 (6th ed. 1990).

zett transmitted a one-page memorandum to "BUYERS SHEEHAN ET. AL.," referencing the December 9, 1988 DROAs and setting forth the following counteroffers for Lots 254 and 256:

1. Lot 254—Purchase price $455,000 Down payment—no change Balance—$360,000

2. Lot 256—Purchase price $515,000 Down payment—no change Balance—$415,000

3. Terms for payment of balance:

Seller offers to provide financing on the above balances at an interest rate of 2% over prime set by Bank of America, San Francisco, as adjusted up or down quarterly (every three months), payable interest only, monthly with a balloon of all unpaid interest and principal 5 years from recordation.

"BUYERS SHEEHAN ET. AL." were further instructed that if they "accept the offer as countered above[,] please sign and date below[.]" In the signature blocks that followed, Sheehan signed as "Buyer" for both lots on December 28, 1988, and Frank, but not Vetra, signed his acknowledgment of the acceptance of both counteroffers on January 6, 1989. The DROAs for each lot, as modified by the counteroffer, will be referred to hereafter as the "Contract." [6]

### B. The Encroachments

On January 31, 1989 Warner requested that First American Title (escrow agent) open separate escrow accounts for the sale of Lots 254 and 256. In March 1989 Warner and Sheehan, accompanied by Frank and Kingzett, inspected Lot 256. At that time, Frank disclosed that the underground utility line, light poles and roadway serving the home on Lot 255, and the north boundary fence, encroached on Lot 256.

Warner and Sheehan wanted some assurances that these encroachments would not impair marketable title to Lot 256. During the inspection, however, Frank discussed with Kingzett the idea of an agreement which would allow Frank some time after closing of the sale to remove the encroachments.

### C. The Addendum to the Contract

Following the inspection, the parties executed, in March 1989, an "Addendum to Contract of Offer to Purchase Lots 254 and 256 (Reference Date December 9, 1988)" (Addendum). The Addendum extended the closing date for the sale of both lots to May 9, 1989 and set forth the financial terms of the sales of both lots, as previously agreed to by the parties. Additionally, the Addendum included the following provision:

2. Buyers hereby approve boundaries of property and release contingency on special terms #1 of the contract. Seller will survey north boundary of Lot 254, south boundary of Lot 256 and note any encroachment of seller's improvements and submit same to buyers for their review.

The Addendum was signed by Warner and Sheehan on March 9, 1989 and by Frank on

---

**6.** On appeal, Defendants contend that they never entered into any contract with Plaintiffs for the sale of Lot 256. Defendants point out that Frank never signed the DROA for Lot 256 and the one-page counteroffer which he signed did "not purport to incorporate the terms of the DROAs," nor "represent an acceptance" of Plaintiffs' DROA for Lot 256. Defendants also assert that "[c]ontrary to Plaintiffs' argument, Frank's [counter]offer nowhere promised to conveny [sic] Lot 256 'free and clear of all liens and encumbrances'" and lacked "other terms essential to satisfying the Statute of Frauds."

Based on our review of the record, we reject Defendants' argument that no contract between the parties existed. It is clear that Frank's De-

cember 23, 1988 counteroffer, on its face, related to the December 9, 1989 DROA for Lot 256, which had been signed by Warner and Sheehan. When Warner and Sheehan thereafter agreed to the terms of the counteroffer and signed, along with Frank, the counteroffer document, the terms of the DROA, as modified by the counteroffer, became the unified contract of the parties. See Young v. McQuerrey, 54 Haw. 433, 435, 508 P.2d 1051, 1052 (1973) (separate writings may be considered together if their relation or connection with each other appear on their face, contain an. express reference to each other, or contain internal evidence of their unity, relation or connection).

March 10, 1989. After signing the Addendum, Frank faxed a copy of the signed Addendum to Warner and Sheehan, along with a message stating in relevant part as follows:

b. Will have survey done so as to show exact encroachment as per boundary So. 256. (see exhibit A below as approx.)

Exhibit A was a sketch by Frank, which showed that a road on Lot 255 slightly encroached on Lot 256[7] and that a light pole and underground wire for the pole encroached approximately four feet onto Lot 256.

### D. *The Closing Date for the Contract and Frank's Receipt of a Higher Offer for Lot 256*

On April 26, 1989 the escrow agent's notes say "HOLD OFF ORDERING DOCS. May be additional Buyer." On May 9, 1989 Plaintiffs notified the escrow agent in writing that due to "circumstances beyond the buyer's [sic] control," they were exercising their right to extend the date of closing, and that "closing [would] be on or before June 8, 1989 for both parcels." Plaintiffs had not yet determined who their purchasing partner(s) would be.

By May 31, 1989 Warner had informed the escrow agent of the identity of the buyers for Lot 254, and by June 8, 1989 the buyers for Lot 254 had fully performed their obligations under the Contract. By June 29, 1989 the parties had signed all necessary documents for the sale of Lot 254 and closing and recordation of the deed and mortgage for Lot 254 took place on July 7, 1989.

As to Lot 256, the escrow agent's June 5, 1989 note says, "Per Cindy Warner, this file is still on hold." By the June 8, 1989 closing date, Frank had not taken any steps to complete the promised survey for encroachments on Lot 256.

On June 26, 1989 Michael Mangana (Mangana), through his real estate agent Ray

Miller (Miller), offered to buy Lot 256 from Defendants for $650,000 cash, an offer which was $135,000 more than Plaintiffs' offer and which did not require seller financing. Frank responded by facsimile the same day, accepting Mangana's offer if Mangana agreed to set the commission at six percent and make his $5,000 deposit non-refundable. Frank explained to Mangana's real estate agent that the reason he wanted the deposit to be non-refundable was as follows:

As I told you when speaking by phone a couple of weeks ago, I do have and can accept at any time a deal on this lot; the only thing different is your buyer would pay cash and on the deal I have now, I'm carrying paper. As I told you the commission on present deal is 6%, and I would expect to pay same 6% to your firm. To take your deal and hold the property off for a period up to October 9 and in meantime lose the deal which is same price would not be too good. So what I feel is fair is for the Buyer to release the [$]5,000 deposit at end of 30[d]ays from my acceptance or July 26, 1989, as a nonrefundable deposit. This would show good intentions on Buyer's part and prove to me he is serious. If for some reason a few extra days were needed to close escrow due to his sale in Calif. I would be reasonable about that. I am sure the Buyer can understand for me to turn down a deal I now have and maybe have no deal at all, I should have a guaranty or at least a show of good intentions by having a nonrefundable $5,000 amt [sic] by July 26, __89. If this plus the 6% comm. is agreeable, we have a deal.

The next day, on June 27, 1989, Mangana agreed to Frank's terms and Miller faxed a revised DROA to Frank for his signature. Frank signed the DROA after further revising it to reflect the terms that he and Mangana had agreed upon, and the parties set October 9, 1989 as the closing date for the sale of Lot 256 to Mangana. Thereafter, on

---

7. The sketch by Frank actually refers to the road, which runs through Lot 255, as a "Road for 256." However, based on the record and the trial court's findings of fact, it appears that the road encroached partly on Lot 256 but did not service Lot 256.

July 21, 1989, an escrow account was opened for the sale of Lot 256 to Mangana.

Unaware of the sale to Mangana and while still proceeding to close the purchase of Lot 254, Sheehan and Warner informed the escrow agent on June 29, 1989 and Kingzett on July 1, 1989 that Bollag was an additional buyer for Lot 256 and that title on the deed for Lot 256 would be in the name of Ideal Development, Inc., the name of Bollag's corporation.

On July 1, 1989 Kingzett, following up on Frank's discussion with him during Sheehan's and Warner's inspection of Lot 256, faxed to Plaintiffs a proposed encroachment agreement, which would allow Frank an unspecified period of years to remove the encroachments on Lot 256. After Bollag revised, to six months, the time period within which Frank was required to relocate the encumbrances on Lot 256 and added to the agreement a requirement that the seller provide a certified survey report and install corner stakes prior to closing of the sale of Lot 256, he signed the encroachment agreement on July 3, 1989. Also on July 3, 1989, Warner faxed a letter to Frank, informing him of her understanding that closing on Lot 254 was scheduled for July 7, that Bollag was the new partner on Lot 256 "who is ready to consummate the transaction immediately," that Bollag would be providing 100% of the financing, that the escrow agent would be sending documents for Lot 256 in a few days, and that the balance of financial information on Bollag would be sent to Frank in a few days. In a postscript, Warner also added that "we do need to address the staking and encroachment issue(s)."

On July 3, 1989 Bollag signed, in his capacity as president of Ideal Development, Supplemental Escrow Instructions which identified Ideal Development as the buyer of Lot 256. On July 11, 1989 Warner faxed to Kingzett the encroachment agreement, as revised by Bollag, and suggested that an existing survey report might suffice if corner pins were clearly visible.

At or about the time Kingzett transmitted the proposed encroachment agreement to Warner, Frank informed Kingzett that he no longer wished to proceed with the Lot 256 transaction. On July 12, 1989 Kingzett wrote to Frank that he (Kingzett) had informed Warner and Sheehan of Frank's desire "not to proceed further with the sale of [Lot 256]" and that "[a]pparently they are ready, willing and able to close with a financially qualified buyer and had transmitted or were in the process of transmitting complete financial information to [Frank]" when they were informed of Frank's desire. That same day, Warner and Sheehan sent financial information on Bollag and a follow-up letter to Frank explaining that they had been waiting for Frank's response with regard to the encroachments, that the encroachment issue could be resolved by a "simple agreement" and a prior survey report, and suggested a meeting for the following week on Moloka'i when Frank would be present so that Warner could view the stakes "to be able to close Lot 256 expeditiously."

However, also on July 12, 1989, Frank notified the escrow agent by facsimile as follows:

> I wish to cancel escrow M–3076 [for Lot 256] as buyers have not complied with time schedule, performance, nor do I understand who I am actually selling to. Certainly it is not to the original parties. It now seems there is a buyer by name of Ideal Development *Inc.*!! I do not wish in any way for the sale to go any further. The original buyers have had more than ample time to complete the purchase, if they had performed, so again, I want the above escrow cancelled at once.

On the following day, July 13, 1989, Frank informed Plaintiffs in a handwritten letter as follows:

> I have instructed Title Co[.] to stop. I have been asking for Financial Info which I feel is only proper as a lender, since March 16. Verbally to [Kingzett] before that. Every time I turn around there is a new name added and we start again. At any rate enough is enough and I want no more, I don't have time for this kind of

thing.... [I]f I can be of help as to 254 let me know while I['']m on Island and I will help. As to 256 I have had it and it[']s off.

On July 14, 1989 Defendants (Frank and Vetra) signed instructions to the escrow agent to cancel the Lot 256 escrow and to reimburse Plaintiffs $4,792 of their $5,000 deposit after deducting the escrow cancellation fee, the commitment for title insurance fee, and the lien check fee.

Plaintiffs' subsequent efforts to revive the sale for Lot 256 were unsuccessful. On November 17, 1989 Defendants' sale of Lot 256 to Mangana closed.

## PROCEDURAL HISTORY

Still unaware that Defendants had sold Lot 256 to Mangana, Plaintiffs filed their Complaint against Defendants on November 24, 1989, seeking specific performance (Count I) and damages for breach of contract (Count II). Upon discovering that Lot 256 had already been sold, Plaintiffs filed a First Amended Complaint on August 19, 1991, adding claims against Frank for breach of warranty of authority, estoppel, negligent misrepresentation of authority, and wilful misrepresentation of authority, and against Vetra for estoppel.

On August 22, 1991 Defendants filed a motion to dismiss Count I of the Amended Complaint, contending that specific performance of the Contract to convey Lot 256 could not be granted since Defendants had already sold Lot 256 prior to the commencement of this action. The circuit court entered its order granting the motion on September 10, 1991.

The parties stipulated that Count II, the breach of contract claim, would be tried separately from Counts III through VII, the misrepresentation of authority and related claims, and a four-day, non-jury trial on Count II commenced on September 9, 1991. On January 9, 1992 the circuit court entered, as to Count II, (1) Findings of Fact and Conclusions of Law, and (2) an Order Directing Entry of Judgment in Favor of Defendants and Against Plaintiffs and directing that "the judgment include a reasonable attorney's fee and costs of court as provided by Chapter 607, Hawaii [Hawai'i] Revised Statutes."

On January 31, 1992 Defendants filed a Motion for Award of Attorneys' Fees and Costs and on February 25, 1992 the circuit court entered a Judgment in favor of Defendants and against Plaintiffs which awarded Defendants $40,990.07 in attorney fees and $4,386.89 in court costs. Subsequently, on April 22, 1992, the court entered an Amended Judgment which revised the earlier Judgment to award Defendants interest at the rate of ten percent (10%) per annum on the entire judgment and confirmed the dismissal by the stipulation of the parties filed April 1, 1992, as to Counts III through VII of the First Amended Complaint. This appeal followed.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Plaintiffs contend that the circuit court erred in entering the following Conclusions of Law (CsOL): (1) that the absence of any contract binding Vetra bars any recovery against Frank for breach of contract; (2) that the Contract for Lot 256 was unenforceable because there was no meeting of the minds regarding encroachments on the property and, therefore, Plaintiffs failed to carry their burden of proving that Frank breached an enforceable land sales contract; and (3) that when Plaintiffs failed to tender performance on or before the June 8, 1989 closing date, they lost their right to enforce the Contract.

■ A trial court's CsOL are reviewed under the right/wrong standard of appellate review. *Nelson v. Boone,* 78 Hawai'i 76, 80, 890 P.2d 313, 317 (1995).

## DISCUSSION

### A. *The Fact That Vetra Did Not Contract To Sell Lot 256*

Plaintiffs do not dispute on appeal that although Vetra owned one-half interest in

Lot 256 as a joint tenant with Frank, she never signed any of the documents upon which the Complaint underlying this lawsuit was based. However, Plaintiffs maintain that the trial court was wrong when it concluded, as a matter of law, that Vetra's failure to sign the documents barred any recovery of damages from Frank for breach of contract. COL No. 3 states as follows:

> 3. However, Vetra Denis never signed any of the documents upon which the complaint is based. The absence of any signed contract binding Vetra Denis bars any recovery against Frank Denis for breach of contract. Vetra Denis did not authorize her husband, in writing or otherwise, to sell her undivided one-half interest in Lot 256. Absent such express authority, Frank Denis was powerless to contract for the sale of any interest in Lot 256. See *Stevens v. Cliffs at Princeville Associates,* 67 Haw. 236, 240, [684 P.2d 965, 968] (1984) (in order to be bound by a contract, the contract must be signed by that person or someone lawfully authorized in writing to do so); *Sawada v. Endo,* 57 Haw. 608, [561 P.2d 1291] (1977). Both the Statute of Frauds and the rule of *Sawada v. Endo* bar any action against Vetra Denis.

We agree with Plaintiffs. The second sentence of COL No. 3 is wrong.

 It is a basic principle of contract law "that the promisor ordinarily is bound to perform his [or her] agreement according to its terms or, if he [or she] unjustifiably fails to perform, to respond in damages for his [or her] breach of the contract." Annotation, *Modern status of the rules regarding impossibility of performance as defense in action for breach of contract,* 84 A.L.R.2d 12, 21 (1962). "It is well settled, that when a party promises to do a thing which becomes impossible by contingencies which should have been foreseen and provided against, ... such impossibility is no defense to an action for a breach of the contract." *Bates v. Prendergast,* 1 Haw. 522, 527 (1856). Stated otherwise:

> The inability to control the actions of a third person whose consent or cooperation is needed for the performance of an undertaking is ordinarily not to be regarded as an impossibility avoiding the obligation or, excusing liability, unless the terms or nature of the contract indicate that such a risk is not assumed. A promisor is not absolved from performance by the neglect or omission of some person upon whom he had depended for such performance. The performance of an absolute promise is not excused by the fact that a third person refuses or fails to take action essential to performance.

17A Am.Jur.2d *Contracts* § 686 (1991).

 In transactions involving the sale or purchase of land, "[a] person may contract to sell land which he does not own.... His [or her] only obligation is to be able to convey a clear title at the time agreed upon for a conveyance." *Barkhorn v. Adlib Assoc., Inc.,* 222 F.Supp. 339, 341 (D.Haw.1963), amended 225 F.Supp. 474 (1964); *aff'd,* 409 F.2d 843 (9th Cir.1969). "Ordinarily, a person is not relieved of liability for breach of a promise to sell property simply because he or she turns out not to have marketable title." *In re Ellis,* 674 F.2d 1238, 1250 (9th Cir. 1982).

 In cases involving the sale of marital property, courts in other jurisdictions have uniformly held that where a vendor contracts to sell land jointly owned with a spouse but is thereafter unable to obtain the spouse's consent to the sale, the vendor remains liable to the vendee for damages.

In *Bobst v. Sons,* 252 S.W.2d 303 (Mo. 1952), for example, a husband contracted to sell some land that he held with his wife as tenants in the entirety, but his wife refused to sign or consent to the sale. The purchaser subsequently filed an action for specific performance or damages for breach of contract and the circuit court dismissed the action. On appeal by the purchaser, the Missouri Supreme Court held that although the wife's refusal to consent barred the purchaser from obtaining equitable relief from the seller, the purchaser was entitled to damages from the husband. The court reasoned:

A vendor who alone has contracted to sell land and who is unable to convey a good title because of the refusal of a spouse to join in a conveyance has been held liable in damages for breach of contract. It is not unlawful for a person to contract to sell and convey something he does not own but expects to acquire, and, if he unqualifiedly undertakes to do that which later he finds he cannot perform, he should suffer the liability the law imposes upon the contract breaker.

*Id.* at 305 (citations and quotation marks omitted).

In *Raisor v. Jackson*, 311 Ky. 803, 225 S.W.2d 657 (1949), a husband sold property he owned with his wife and was unable to convey to the purchaser because his wife refused to join in the deed. Shortly thereafter, the wife joined in the sale of the property to another party. In concluding that the buyer was entitled to recover substantial damages and was not limited to an award of nominal damages, the Kentucky court of appeals stated:

[T]he buyer may recover substantial damages, if he can prove them, without regard to the seller's good faith, if the breach of contract is occasioned by the failure of the seller to obtain a conveyance of his wife's interest in the property.

This is simply a recognition of the principle that where a seller unconditionally agrees to convey real property, knowing that he has no title or with knowledge of an outstanding interest therein owned by a third party, he is bound by his undertaking to deliver a good deed to the purchaser; the question of good faith is immaterial if he breaches his agreement; and if the buyer is so damaged, he may recover the difference between the contract price and the reasonable market value of the property at the time the contract was executed.

*Id.* 225 S.W.2d at 660.

Similarly, the (State) Supreme Court of Appeals held in *Greer v. Doriot*, 137 Va. 589, 120 S.E. 291, 293 (1923), that a vendor cannot escape damages for breach of an unconditional land sale contract by showing that his wife refused to consent to the sale, thus preventing conveyance. *In accord Kaufman v. Bell*, 89 Cal.App. 610, 265 P. 317 (1928).

In this case, when Frank signed the Contract to sell to Plaintiffs Lot 256, he knew that he would need Vetra's consent in order to convey marketable title. When he thereafter failed to obtain Vetra's consent to the sale, he breached his Contract with Plaintiffs and, pursuant to the principles outlined above, subjected himself to liability for damages suffered by Plaintiffs as a result of his breach. Although Vetra's failure to consent to the sale rendered it impossible for Plaintiffs to obtain specific performance of Frank's obligations under the Contract, such failure does not shield Frank from liability for damages.

## B. The Fact That The Parties Did Not Agree To A Settlement Regarding the Encroachments

Plaintiffs assert that the trial court erred in concluding, as a matter of law, that the Contract was unenforceable because there was no meeting of the minds regarding encroachments on Lot 256. Specifically, Plaintiffs contend that the following CsOL are wrong:

12. Finally, the Court concludes that enforcement of the memorandum against Defendant Frank Denis is barred by failure of the parties to conclude an agreement resolving the issue of encroachments. A land sales contract containing certain essential terms can be found to be valid and enforceable only if the parties at the time of contracting had no expectations that any essential provision would be negotiated later. *Honolulu Waterfront Ltd. v. Aloha Tower Dev.*, 692 F.Supp. 1230, 1235 (D.Haw.1988), (citing *Francone v. McClay*, 41 Haw. 72 (1955)).

13. The Plaintiffs regarded, and this Court concludes as a matter of law, the encroachment issue as an essential element of their offer to purchase Lot 256. The

materiality of the agreement is evidenced by the belief of Plaintiffs as well as escrow that the Lot 256 transaction could not close without an agreement resolving the issue.

14. It is equally clear that there was never a meeting of the minds with respect to this essential term, and that Plaintiffs were never willing to relieve Frank Denis of the obligation they believed he was under to remove the encroachments. At best, Plaintiffs offered to undertake the survey themselves so that the extent of the encroachments could be determined with precision.

15. However, the survey would not supply answers to the question of when the encroachments would be resolved, and at whose expense. Absent a meeting of the minds with respect to this essential term, the memorandum could not represent an enforceable agreement.

16. Even if the Court were to conclude that the encroachment issue was not material, Plaintiffs' claims are barred by their failure to tender their performance by the extended closing date. Plaintiffs did not remedy their default by contacting escrow on August 2 and offering a deposit on terms acceptable to Bollag. Accordingly, they have failed to prove their readiness, willingness, and ability to timely perform. PR Pension Fund v. Nakada, supra [8 Haw.App. 480, 809 P.2d 1139 (1991)].

17. The requirement of tender is not excused by the absence of an encroachment agreement. This issue was not a condition precedent to the obligation of Plaintiffs to perform prior to the June 8 extended closing date; the encroachments did not render title unmarketable and could have been resolved after closing.

CsOL 13 and 17 are in conflict. We agree with CsOL 13 and 14 and disagree with CsOL 12 and 17. The trial court was wrong when it concluded that the failure of the parties to resolve the encroachment issue rendered the Contract unenforceable by Plaintiffs against Frank. The encroachment issue imposed a burden upon Frank, not upon Plaintiffs. Under Standard Term B of the DROA for Lot 256, as modified by Frank's counteroffer, Frank was obligated to

furnish Buyer evidence of title from a licensed abstractor showing Seller's marketable title to the interest which is to be conveyed to Buyer. If Seller fails to deliver title as herein provided, Buyer at his option may terminate this agreement and any deposits shall be returned to Buyer.

"Marketable title" is "a title which is free from encumbrances and any reasonable doubt as to its validity, ... so far free from defects as to enable the purchaser not only to hold the land in peace but also, if he wishes to sell it, to be reasonably sure that no flaw will appear to disturb its market value." Clarke v. Title Guaranty Co., 44 Haw. 261, 269–70, 353 P.2d 1002, 1007 (1960) (citation and internal quotation marks omitted). The term "encumbrance" is

construed broadly to include not merely liens such as mortgages, judgment liens, taxes, or others to which the land may be subjected to sale for their payment, but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted.

Create 21 Chuo, Inc. v. Southwest Slopes, Inc., 81 Hawai'i 512, 525, 918 P.2d 1168, 1181 (App.1996) (citation and internal quotation marks omitted).

In this case, it is undisputed that a light pole, underground wiring to the pole, and a portion of the driveway to the adjoining Lot 255 encroached onto Lot 256. These encroachments clouded the title to Lot 256 and Frank was obligated to clear the cloud in order to meet his obligation to convey to Plaintiffs marketable title to Lot 256.

Frank's contractual obligation left him with the following two choices: (1) remove the encroachments and convey marketable title at closing; or (2) negotiate an alternative acceptable to the Plaintiffs. Frank did neither. Under the terms of the DROA re-

garding marketable title, Frank's failure to resolve the encroachment issue by the stated closing date did not give him the right, as the seller, to rescind the Contract. Frank's inability to deliver marketable title to Plaintiffs gave the Plaintiffs the right to continue to seek performance of the Contract.

### C. *The Fact that the Plaintiffs Did Not Tender Performance on or Before June 8, 1989*

We agree with Plaintiffs that the trial court was wrong when it concluded that because Plaintiffs failed to tender performance for the purchase of Lot 256 on or before June 8, 1989, the extended closing date of the Contract, Defendants were thereafter authorized to sell Lot 256 to a third party.

The relevant CsOL state as follows:

6. ... Plaintiffs acknowledged at trial that their contract required a written agreement extending closing in order to have any contractual right to purchase Lot 256 after passage of the June 8 extended closing date.

7. Defendants were not bound to sell to Plaintiffs for an indefinite time and in a short term DROA contract as here, the time of performance was sufficiently material to justify rescission by Defendants. (Citation omitted.)

8. The absence of such agreement operated to extinguish any right on the part of Plaintiffs to bring a subsequent action for damages based on Defendants' decision to sell Lot 256 to another buyer. *Stevens v. Cliffs at Princeville Associates,* 67 Haw. at 241, [684 P.2d 965] ("Clearly a breach can occur only when one is under an obligation to perform in the first instance.").

9. Plaintiffs cannot, therefore, complain of the subsequent sale of Lot 256 because at that point they were the party in default, and they had done nothing to preserve any rights they may have had to purchase Lot 256 on the extended closing date of June 8. To the contrary, Plaintiffs claimed at trial that they possessed the ability to close the Lot 256 transaction on June 8 without [the] resources of Ben Bollag, yet they made a conscious decision not to do so.

\* \* \* \* \* \*

16. Even if the Court were to conclude that the encroachment issue was not material, Plaintiffs' claims are barred by their failure to tender their performance by the extended closing date. Plaintiffs did not remedy their default by contacting escrow on August 2 and offering a deposit on terms acceptable to Bollag. Accordingly they have failed to prove their readiness, willingness, and ability to timely perform. *PR Pension Fund v. Nakada, supra.*

17. The requirement of tender is not excused by the absence of an encroachment agreement. This issue was not a condition precedent to the obligation of Plaintiffs to perform prior to the June 8 extended closing date; the encroachments did not render title "unmarketable" and could have been resolved after closing.

18. The Court's conclusion in this regard is not altered by the fact that Kingzett provided a copy of his proposed encroachment agreement on July 1; his actions in this regard could not represent "continuing performance" such that Plaintiffs can be relieved on [sic] their default.

19. Based on the foregoing, this Court concludes that Plaintiffs have failed to carry their burden of proving that Defendants breached an enforceable land sales contract.

The following FsOF are also relevant:

80. Defendants did not by their actions imply any agreement to extending the June 8 extended closing date for Lot 256.

\* \* \* \* \* \*

82. If there could be any inference by Defendant's [sic] conduct that they were waiving the extended closing date, than [sic] thirty days would be a reasonable time for any further extension.

83. On July 8 Plaintiffs were not ready, willing or able to close on Lot 256 and were not in compliance with time of performance provisions of the DROA.

■ As previously discussed, we disagree with COL 17's statement that "the encroachments did not render title 'unmarketable[.]'" It is undisputed that Frank was unable to convey marketable title. Moreover, Plaintiffs never agreed that closing would occur notwithstanding the undisputed encroachment problem and Frank's undisputed inability to convey marketable title. Until Frank was able to convey marketable title or to negotiate an alternative acceptable to the Plaintiffs (and Vetra agreed to convey her one-half interest), closing was not possible.

■ "Courts ... have seldom regarded time as absolute or unbending within the context of a bilateral contract for the purchase and sale of land." *Freeman v. Boyce,* 66 Haw. 327, 332, 661 P.2d 702, 705 (1983). Indeed, even where a contract for the sale of land includes a "time is of the essence" clause, the clause can be waived by a party who acts inconsistently with the purpose of the clause by, for example, proceeding with performance of the contract after the closing date of the contract. *Stevens v. Cliffs at Princeville Assoc.,* 67 Haw. 236, 243, 684 P.2d 965, 970, *recon. denied,* 67 Haw. 684, 744 P.2d 780 (1984). In *Stevens,* the court decided that the seller waived its right to enforce the condition of time being of the essence where he had full knowledge of the expiration of the performance dates, and allowed the buyers to proceed with their performance. It further decided that the seller could have reinstated a time of performance obligation by notifying the buyers of its intention to do so. *Id.* at 244, 684 P.2d at 970 (citations omitted).

■ In *Kalinowski v. Yeh,* 9 Haw.App. 473, 847 P.2d 673 (1993), the buyers entered into a contract to purchase a condominium unit from the sellers, but closure of the sales transaction was contingent on the sellers' purchase of a home, the construction of which was delayed for several months past the original closing date. Although the buyers did not "tender" performance, they at all times remained fully ready, willing, and able to perform their obligations under the contract, which included a "time is of the essence" clause. However, after the lapse of the closing date, which had been extended twice in writing, the sellers relied on the clause to cancel their contract with the buyers and accept a higher offer for the sellers' condominium unit. *Id.* at 476–77, 847 P.2d at 675–76. We held that the buyers were entitled to specific performance of their contract with the sellers. *Id.* at 483, 847 P.2d at 679. In other words, a seller cannot rely on a "time is of the essence" clause to cancel the contract, where the buyers are ready, willing, and able to perform their obligations under the contract but the sellers are unable to perform and are responsible for the delay in closing. *Id.* at 478–79, 847 P.2d at 676–77.

■ In the instant case, both the seller and the buyers were unable to perform on the scheduled closing date and both were responsible for the delay in closing. Even assuming the parties by their actions did not implicitly extend the closing date, the following principles of law barred Frank from terminating his Contract to sell to Plaintiffs.

Although one party may not alone rescind a contract of sale of real property, he may, nevertheless, by neglecting or refusing to perform it on his part, place it in the power of the other party, who is not also derelict, to avoid the contract or not, at his pleasure. This right of rescission must be exercised within a reasonable time after the default of the other party. Equity will not permit one party, in whose favor a right of rescission has arisen, to delay unreasonably the exercise of the right and thus speculate on the rise or fall in the value of the land.

As a general rule, a party who asks for the rescission must himself be without fault, and when the payment of the purchase money and the making or tender of the deed are to occur simultaneously, they

are regarded as mutual and concurrent acts, which disable either party from putting an end to the contract without performance or a valid offer to perform on his part, and, so far as the question of time is concerned, both parties, after the day provided for the consummation, may be considered equally in default, and neither can hold himself discharged from the obligation of complete performance until he has tendered performance on his own side and demanded it on the other. The mere neglect of both parties to perform the contract on the day fixed for its performance cannot, without anything more, operate as a rescission.

77 Am.Jur.2d *Vendor and Purchaser* § 536 (1975) (citations omitted).

■ Moreover, we conclude that in a situation such as this, where prior to the scheduled closing date the parties are aware that encroachments by the seller's lot adjoining the lot to be conveyed prevent the seller from conveying marketable title, the contract of the parties is silent as to the buyers' rights in such a situation, and the parties agree that "[s]eller will survey ... south boundary of [the Lot] and note any encroachment of seller's improvements and submit same to buyers for their review[,]" the seller's failure to comply with his obligations under the agreement on or before the closing date is an implicit extension of the closing date for the benefit of the buyers at least until the seller complies with his obligations under the agreement.

### D. *Frank Breached the Contract*

■ Frank's communications to Kingzett, the escrow agent, and Frank's cancelling the Lot 256 Contract and the related escrow account was his unequivocal repudiation of and absolute refusal to perform the Contract. Frank's actions amounted to a breach of the Contract. *See Golf Carts, Inc. v. Mid–Pacific Country Club*, 53 Haw. 357, 360, 493 P.2d 1338, 1340 (1972).

Where an anticipatory repudiation of the contract by the vendor is treated as a breach by the vendee, his right to bring an action for damages for the breach is not conditioned upon any further performance, or tender of performance, of the contract upon his part, provided that it appears that he was ready, able, and willing to perform the contract upon his own part in accordance with its terms.

77 Am.Jur.2d *Vendor and Purchaser* § 518 (1975).

### CONCLUSION

Accordingly, we vacate the April 22, 1992 Amended Judgment and the February 25, 1992 Order Denying Plaintiffs' Motion for Reconsideration of Award of Attorneys Fees in Order Directing Entry of Judgment in Favor of Defendants Filed [January 9, 1992]. We remand for the entry of judgment in favor of Defendant Vetra Denis, for the adjudication of Plaintiffs' claim against Frank for damages for breach of the Contract, and for such other relief as may be authorized and appropriate.